Hodgson's Estate.

Argued May 14, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Hardie Scott,* with him *John R. K. Scott, Wm. T. Connor, Truman D. Wade* and *John N. Guss,* for appellant.

*J. Paul MacElree,* with him *Thomas J. Mullaney,* for appellee.

OPINION BY MR. JUSTICE MAXEY, May 27, 1941:

This is an appeal from the refusal of the court below to remove a substituted trustee of a testamentary trust.

On October 18, 1917, William H. Hodgson died leaving an estate appraised at $184,180 and a last will wherein he set up various trust estates. The principal asset of the largest of these estates the testator described as his "newspaper business known as the Daily Local News Company of West Chester, Pa.," (hereinafter referred to as the company), with a capital stock of $100,000, which testator organized himself before his death. He retained 997 shares of the 1,000 shares authorized and outstanding. *This* estate was on January 16, 1936, when the petition for a substituted trustee was filed, carried on the books of the Chester County Trust Company as "949 shares Daily Local News, appraised 1917: $142,350; approximate present worth: $94,900." The approximate present worth of the *whole* estate is set down in that petition as $139,800.

The chief beneficiaries of this testamentary trust estate are the present appellants, Anne G. Hodgson (the widow of testator's deceased son) and her two daughters, Wilhelmina D. Hodgson and Ann Hodgson Thomas,

252

both adults. The income from this trust estate was, subject to certain substantial payments made to others as hereinafter noted, to be paid as follows: $100.00 a month to Anne G. Hodgson so long as she shall remain his son's widow, and the remainder of the income was to be paid "for the support, care, education and maintenance" of testator's grandchildren, Wilhelmina D. Hodgson, and Ann Hodgson Thomas, or the survivor of them. The will also provided for the creation of a trust fund of $10,000, the net income from which was to be paid to a grandniece of testator, Emma D. Hodgson, for and during her natural life. The dividends from 182 shares of stock of the company are payable under the will to persons occupying certain designated positions with the "Daily Local News Company", such as editor, business manager, etc. An annual pension of $800 was provided for the wife of the then editor of this newspaper, upon the death of the latter. Pensions were also provided for four members of the newspaper staff if they should become unable to "fill properly their respective offices." The will further provided that upon the death of testator's daughter-in-law and grandchildren and his grandniece, the whole principal and accumulated income of the estate shall be divided in equal shares per stirpes among the children and issue of any deceased child of these grandchildren and that if there should be no children or issue "of any deceased children of my said granddaughters or of either of them then living, then in that event" the trustee is ordered to divide the whole of the estate equally between testator's sisters or their respective heirs. The testator also provided as follows: "It is my purpose to provide for the continuance of the business and policy of the Daily Local News Company of West Chester, Pa., as at present conducted believing that by so doing my estate will greatly profit thereby; and I, therefore authorize my said trustee to retain all my stock in the said . . . company . . ., as also

the shares of the capital stock of the Chester County Trust Company, which I may hold at the time of my death, as part of my estate during the continuance of said trusts, and at the termination thereof to distribute said stock in kind."

Testator appointed the Chester County Trust Company of West Chester, executor and trustee. This company administered the trust until the Secretary of Banking took possession of it for liquidation on February 14, 1933. On January 17, 1936, the court below appointed as substituted trustee, William Kessler, a brother-in-law of the widow beneficiary. This appointment of Kessler was made at the request of the three appellants here, who are now asking for his removal. After his appointment as trustee, Kessler consulted with these beneficiaries, with the result that at the next meeting of the stockholders, he was elected President of the corporation, Miss Wilhelmina D. Hodgson, one of the cestui que trustents (the elder granddaughter) was elected Vice-President, Thomas J. Mullany, Esq., of the Philadelphia Bar, was elected Secretary, and Paul K. Guthrie, Esq., of the Chester County Bar, was elected Treasurer. These also constituted the Board of Directors. Miss Hodgson served as Vice-President until the middle of the year 1936, after which on account of a disagreement with Kessler she attended no meetings. Mr. Guthrie later gave up his office as Treasurer. Mr. Mullany has since functioned as both Secretary and Treasurer.

The present proceedings were brought under the Fiduciaries Act of June 7, 1917, P. L. 447, section 53(a)9, which provides at page 519: "When all the cestui que trust, or a majority of them, having the life estate under any trust, shall desire the removal of the trustee or trustees upon any substantial ground not hereinbefore enumerated, and the court, upon petition filed by them or any of them, shall be satisfied that such substantial

ground for removal exists; in which case the court may remove said trustee or trustees, and appoint another or others as chosen by said parties."

The grounds on which the removal of the substituted trustee is asked for are grouped as follows: (1) hostile and malicious attitude of the trustee toward the life tenants; (2) failure of the trustee to perform his duties, to the disadvantage of the trust estate and discrimination against the life tenants; and (3) use by the trustee of his office for his personal benefit and that of his counsel.

This record furnishes ample proof of the charge that the trustee exhibited a hostile and malicious attitude toward these life tenants. An example of this was Kessler's prosecution of Mrs. Ann Hodgson Thomas on a charge of larceny. It had been customary for the appellants to visit the office of the "Daily Local News" whenever they desired and to use the stamps and stationery of the company. They had done this when the testator managed the newspaper. The trustee directed the office manager to refuse the appellants any further stamps or stationery. These instructions were not communicated to the appellants. Mrs. Thomas and her mother went to the office and when their request for some stationery was refused, they took 12 sheets of paper and three envelopes from the desk. When Kessler learned of this, he appeared before a Justice of the Peace, nine miles away from West Chester, and swore out a warrant for the arrest of Mrs. Thomas, charging her with larceny of the stationery. The grand jury ignored the bill and placed the costs of prosecution upon Kessler. Shortly after bail had been entered by Mrs. Thomas, an article appeared in the "Daily Local News" with Mr. Kessler's approval, which carried the heading: "Woman Charged With Serious Larceny". Later Mrs. Thomas brought an action against Kessler for malicious prosecution and the jury at the second trial brought in a verdict in the sum of $500. (At the

first trial plaintiff had been nonsuited. See *Thomas v. Kessler et al.*, 334 Pa. 7, 5 A. 2d 187.*) Kessler's excuse for making the arrest was that he took that action to maintain his authority and prestige in the office of the newspaper and among the employees thereof. The court below characterized Kessler's conduct in this matter as "tactless in the extreme". We think appellants' characterization of this action much more appropriate, to wit: that it was "wanton maliciousness for which there can be no justification found."

Another example cited as indicating maliciousness on the part of Kessler toward these beneficiaries was an action in ejectment which he instituted. Kessler sent a letter to the three beneficiaries in reference to three pieces of real estate, which they were using. One piece of real estate was in the Wilhelmina Hodgson Estate, of which appellee was also appointed substituted trustee on the petition of the two granddaughters. Another piece of real estate was part of the corpus of the instant trust estate and the last piece of real estate, a life estate, was vested in one of the appellants by the terms of the will of Wilhelmina Hodgson, deceased. Kessler had no control or interest whatever in the life estate of the last mentioned piece of real estate. When the three appellants refused to execute an agreement authorizing the use by Kessler of the three pieces of real estate, he caused an ejectment proceeding to be started against them for the real estate in which Mrs. Hodgson lived. After appellants consulted with their counsel,

---

* In this action to recover damages for malicious prosecution the trial judge entered a compulsory nonsuit, which the court in banc refused to take off on the ground that probable cause for the prosecution appeared in plaintiff's case. Upon appeal to the Supreme Court, which reversed the court below, it was held that "to cause appellant's arrest and subsequent prosecution, under the facts here shown, gave her a well founded right of action for malicious prosecution and the court erred in refusing to submit the case to the jury."

an agreement was prepared and willingly executed by all of the appellants, authorizing the use by him of the first two mentioned pieces of real estate, excluding any mention of the real estate owned by the life tenant. The ejectment proceedings were thereupon terminated. The court characterized the institution of these ejectment proceedings as "ill-advised and unnecessary" but held them not to be substantial grounds for the trustee's removal. This action on the part of the trustee showed marked hostility toward these appellants and was entirely unwarranted.

It was shown that Kessler changed his attitude toward Mrs. Hodgson and her daughters immediately after his appointment as trustee, that he boasted to them that he "had practically everything" and they "had nothing." He told Mrs. Hodgson that he was going to take her home away from her and she would have to live in an apartment. Mrs. Hodgson testified (and her testimony was not contradicted) that Kessler said: "He was going to take my home from me and make apartments out of it, and he was moving in there himself and he would give us thirty days to vacate." He also attempted to direct Mrs. Hodgson how she should vote and told her she "could not be buried in the Hodgson plot in Oakland Cemetery," where Mrs. Hodgson's husband and other relatives are buried, and that she would "have to attend" a certain church. From the testimony it appears that Kessler almost as soon as he was clothed with the authority of a trustee started out to make himself personally offensive to Mrs. Hodgson and her daughters and that his effort was completely successful. It is inconceivable that this or any other testator would ever want his kindred who were the special objects of his bounty subjected to such contumely as this trustee has visited upon testator's daughter-in-law and grandchildren. The trustee and the chief beneficiaries of this trust are no longer on speaking terms, and it is therefore

impossible for them to confer in any spirit of amity and helpfulness on matters relative to the trust estate.

In *Price's Est.*, 209 Pa. 210, 212, 58 A. 280, this court said: "While inharmonious relations between trustee and cestui que trust, not altogether the fault of the former, will not generally be considered a sufficient cause for removal, yet where they have reached so acrimonious a condition as to make any personal intercourse impossible and to hinder the proper transaction of business between the parties, a due regard for the interests of the estate and the rights of the cestui que trust may require a change of trustee." Scott on Trusts, Vol. 1, sec. 107, states: "The question has not infrequently arisen whether the beneficiaries can force the removal of the trustee on account of friction or hostility between him and them. The mere fact that there is such friction or hostility is not necessarily a sufficient ground for removal, since otherwise the beneficiaries could by quarreling with the trustee force him out. Thus in *Forster v. Davies*, 4 DeG. F. & J. 133, 139, Lord Justice TURNER said: 'I certainly cannot agree with the argument at the bar that the mere fact of there being a dissension between one of the several cestuis que trust and the trustee is a sufficient ground for this court removing that trustee from the trust, because the consequence of that would be that one cestui que trust might at any time raise a quarrel with the trustee and thereupon come to this court to discharge the trustee and remove him from the trust upon the ground of the impossibility of their acting together. It would be the duty of the court, as I conceive, in all cases of that description, to inquire and ascertain from whose fault that dissension or that cessation of friendly intercourse has arisen.' On the other hand, where there is such friction or hostility as seriously to impede the proper performance of the trust, especially if the trustee is at fault, the trustee will be removed."

258

What this court, speaking through Justice DEAN, said in *Bryson v. Wood*, 187 Pa. 366, 41 A. 473, (reversing a decree of the court below dismissing a bill asking for the removal of a trustee) is apposite to the facts in this case, to wit: "This is not a testamentary trusteeship, or one, by deed, where the fiduciary relation is constituted by a testator or a grantor, because of his confidence in his appointee, which, when accepted, the trustee may feel it his duty to execute in accordance with his views of fidelity, and against the objections of the cestui que trust. It was a trust by the appointment of the debtor, and the trustee ought not to have continued in it a moment after the confidence of the creditors in him was withdrawn. It is not material that he was innocent of actual misfeasance; his conduct ought to meet the approval of those whose interests were to be promoted, for his whole duty was to them. His very obstinacy in holding on to his office in defiance of their wishes not only shows an absence of that sensitiveness to imputation generally possessed by the self-respecting, but of itself warranted suspicion of loyalty to the interests of those for whom he professed to act. As said by Lord NOTTINGHAM, in *Uvedale v. Ettrick*, 2 Cases in Chancery 130, 'He liked not that a man should be ambitious of a trust, when he could get nothing but trouble by it.'" In *Neafie's Est.*, 199 Pa. 307, 313, this court said: "If his [the trustee's] management of the trust justly subjects him to criticism and to a lack of confidence by the cestui que trust, he should not be continued in control of the estate. The relation of trustee and cestui que trust is one of confidence, and when either abuses that confidence, he must assume the responsibility." In *Marsden's Est.*, 166 Pa. 213, 31 A. 46, this court held: "The power of the court under the Act of April 9, 1868, . . . is not dependent upon the misconduct of the trustee sought to be superseded; and it is enough to show that his retention, by reason of the existence of hostile relations between him and the cestui

que trust, would materially work disadvantage, inconvenience and great discomfort to the latter."

In *May v. May,* 167 U. S. 310, which was a case where a testamentary trustee had been removed from his office, the Supreme Court of the United States said: "The power of a court of equity to remove a trustee, and to substitute another in his place, is incidental to its paramount duty to see that trusts are properly executed; and may properly be exercised whenever such a state of mutual ill-feeling, growing out of his behaviour, exists between the trustees, or between the trustee in question and the beneficiaries, that his continuance in office would be detrimental to the execution of the trust, even if for no other reason than that human infirmity would prevent the cotrustee or the beneficiaries from working in harmony with him, and although charges of misconduct against him are either not made out, or are greatly exaggerated. *Uvedale v. Ettrick,* 2 Ch. Cas. 130; *Letterstedt v. Broers,* 9 App. Cas. 371, 386; *McPherson v. Cox,* 96 U. S. 404, 419; *Scott v. Rand,* 118 Mass. 215, 218; *Wilson v. Wilson,* 145 Mass. 490, 493; 2 Story Eq. Jur. sec. 1288." In *Wilson v. Wilson et al.,* 145 Mass. 490, 14 N. E. 521, the Supreme Judicial Court of Massachusetts held that where the relation of father and son existed between the cestui que trust and trustee, and a state of hostility had arisen, attributable to some extent to the fault of the trustee, it was competent for the court to remove the trustee for this cause, as the removal seemed to be essential to the interests of the beneficiary.

The court below cites *Mathues' Est.,* 322 Pa. 358, 185 A. 768. In that case an attempt to remove a testamentary trustee was made. This court there cited *Neafie's Est.,* 199 Pa. 307, 49 A. 129, in which it was held that there must be a substantial reason before the court will remove a trustee, who enjoyed the confidence of the person who created the trust. This court said in *Mathues' Estate:* "A testator has, as a property right, the priv-

ilege and power to place the management of his estate in a selected person as a condition of his bounty. . . . Active antagonism of the beneficiaries of an estate toward a fiduciary, while undesirable, is not sufficient to compel the courts to order the latter's removal, unless provoked by him and likely to jeopardize the estate." In the instant case, the trustee whose removal is sought is not a testamentary trustee. Furthermore, the antagonism existing between him and the beneficiaries has obviously been provoked by him and it is clear to us that this antagonism is "likely to jeopardize the estate".

As to the second ground urged by petitioners for the trustee's removal, to wit, the trustee's failure to perform his duties, the court below pointed out that from 1936 to 1939, the company showed a profit each year varying from $10,966.67 in 1936 to $3,441.82 in 1939, that dividends had been paid during the four years of respondent's administration in amounts aggregating $3,000 more than for the four-year period immediately preceding. The court added: "Substantial depreciation and reserves for replacements and repairs have been set up annually and maintained more than is necessary according to petitioners' contention but not so great in our opinion as to be held to exceed the dictates of reasonably sound business judgment and discretion. While of course they reduce the income of the trust, to the dissatisfaction of petitioners, we do not believe they are seriously objectionable in amount, as is urged upon us, or out of line with a properly conservative management of the business. The corporation appears to be in better financial position now than when respondent assumed control thereof and petitioners have received more income than formerly." The record supports these findings.

Another complaint of the petitioners is that they were not permitted to have access to the books and records of the corporation in order to acquaint themselves with facts which they were entitled to have. The

court below characterized this as follows: "Here again is an instance of tactlessness and lack of wisdom in refusing petitioners and their counsel full and complete opportunity to examine the books of the corporation. . . . What valid objection there was to granting their request for such examination is difficult to see as of course the information sought could eventually be obtained by them, as in fact it was in the testimony in this proceeding."

Appellants charge that the trustee used his position improperly for his personal profit and advantage. After Kessler was sued by Mrs. Thomas for malicious prosecution he caused a scire facias to be issued bringing in the publishing corporation as an additional defendant. The jury absolved the additional defendant and rendered judgment against Kessler for $500. Judgment was duly entered and the costs amounting to $193.00 were paid by Kessler, but, as he testified, he paid "none of the expenses arising out of the case of Anne H. Thomas v. Wm. R. Kessler, but all were paid by the publishing company." On the very day that Kessler was served by the sheriff with a writ of capias ad respondendum, together with an affidavit to hold to bail and a statement of claim in the case of Anne Hodgson Thomas v. Wm. R. Kessler, in which case Mrs. Thomas was suing for the recovery of $50,000 on a cause of action growing out of her arrest on the charge of larceny, Kessler called together the members of the executive committee of the Board of Directors of the Company, which consisted of himself, Paul J. Guthrie, and Thomas J. Mullany, the latter being the attorney who was Secretary and Treasurer of the company and Kessler's personal counsel and who as the possessor of a "general brokerage license" handled all of the insurance of the company. At this meeting this committee passed a resolution that the company assume "all liability for the payment of any judgment which may be obtained against" Kessler, and "Further resolved that

the action of the officers in this corporation in having already this day posted cash bail of $500 in Mr. Kessler's behalf out of the funds of this corporation be and the same hereby is approved and adopted," and "further resolved, that the proper officers of this corporation are hereby authorized and empowered to pay for any and all court costs, attorney's fees, witness fees, or other costs or fees of any kind which may be incurred in the defense of this case throughout, Mr. Kessler being hereby authorized and empowered to pay any and all such expenses as and when incurred, in his sole discretion." This action of the executive committee was subsequently approved by the Board of Directors, which board was elected by the votes of Mr. Kessler, who, under the will of testator, votes in his capacity as trustee the stock of the company for the election of directors, the four original directors named in the will no longer serving as such. In other words, Kessler, whose relationship to this company is that of trustee, took action as trustee to impose upon the company the entire financial burden, no matter how great it might be, of the litigation which he had precipitated upon himself *personally* by his tort. By virtue of this resolution, if Mrs. Thomas had recovered $5,000 or any other large sum, the judgment would have been paid by the company, as the $500 judgment recovered *was* paid. The effect of this was to penalize the three chief beneficiaries of this trust for Kessler's wrong done to one of them. This action is a violation of the law. The Restatement of Trust, sec. 247, comment (a), states, inter alia: "The trustee is personally liable to third persons for torts committed by him in the course of the administration of the trust." Comment (d) states: "If the trustee was at fault in incurring the liability, he is not entitled to indemnity." In the instant case the trustee took steps to place the entire financial liability for his fault upon the trust estate even before the question of his liability to Mrs.

Thomas was adjudicated. His action showed that either he had no proper conception of his duty under his fiduciary relationship to this trust estate or he defiantly breached that duty. The $693 which Kessler saddled upon the company to reimburse him for the judgment and costs the jury imposed on *him personally* in this malicious prosecution case, and any other costs incident to the same suit and saddled by Kessler on the company, make him properly the subject of a surcharge against him as trustee.

As further proof of the trustee using trust property for his own advantage, the appellants cite the fact that "due bills" owned by the publishing company for hotel advertising carried in the newspaper were purchased by Kessler for 15% of their face value and used by him at their face value. Kessler acquired due bills on 15 hotels in Florida, Atlantic City, Philadelphia and in the Pocono Mountains of the face value of $1,807.80, for $271.19. The latter was the exact amount of the commissions paid by the publishing company to the advertising agencies which secured this business. Therefore the company supplied $1,807.80 worth of advertising to various hotels and received absolutely nothing for it while Kessler received $1,807.80 worth of hotel accommodations and food for it. We cannot agree with the court below that "the corporation lost nothing in the due bills that respondent purchased, though it was testified that one such due bill was sold for 50% rather than the 15% of its value that respondent paid for those that he bought." It is idle to say that setting up and printing advertisements cost a newspaper nothing. If other advertisers paid for their space with due bills and Kessler proceeded to appropriate these also to his own personal use after paying the company 15% of their face value, this 15% yielding only enough to pay for the securing of this business, the company would soon be drained of its financial life blood, which is payments for advertising.

Kessler's use of these due bills to his own personal gain was clearly a breach of trust and subjects him to a surcharge for their fair value less what he paid for them.

Complaint is also made of the bonuses paid out of the earnings of the company to both this trustee and his personal counsel, who resided in Philadelphia. For the following years the trustee received, respectively, the following bonuses: 1936, $250; 1937, $500; 1938, $400; 1939, $400; totaling $1,550. His counsel received total bonuses for the years 1936, 1938 and 1939 of $650. In 1936 Kessler received a salary of $75 a week. He also received certain payments (apparently legitimate) on account of "mileage" and "expenses." There is also some testimony of his about certain employees who worked nights when election returns were given out as receiving "time and half time according to their weekly pay" and he said that "on these occasions" he "was compensated on the same basis as the others." Just why Kessler, the chief executive of this company, and his counsel should receive "bonuses" and he should receive extra pay for "overtime," is not clear and is a matter about which the life tenants are justified in inquiring about. The practice of the administrator of this trust directing, or even permitting, his personally chosen Board of Directors to pay him and his counsel annual bonuses is not compatible with his fiduciary status in respect to the trust property committed to his keeping. As to these bonuses, the court below said: "The good taste of his action in accepting the bonus that he did, especially after his salary had been increased to what is certainly a full and fair one, is open to serious question when it is considered that every dollar thereof comes out of his beneficiaries' pockets."

There is also complaint made of the action of this trustee in taking all of the insurance business (fire, liability and the business of bonding the company's employees) away from local insurance agents, who had previously handled it, and giving it to his personal coun-

sel, a Philadelphia lawyer, who had an insurance broker-
age license. The annual insurance premiums amounted
to about $1,000. The inference is legitimate that the tak-
ing away of insurance business from the local insurance
agents and giving it to an insurance broker residing in
another county tends to impair the good will toward
this newspaper of the community on whose support the
success of the newspaper depends.

The appellants also complain that the trustee has an
interest in the newspaper corporation in such a way as
to discriminate against them as life tenants by with-
holding dividends or using the dividends for permanent
investments in the company. Appellants say: "For the
year 1936, after all deductions and depreciation, the net
income exceeded the dividends by the sum of $6,086.25,
which was added to surplus; for the year 1937 the net
income, after all deductions and depreciation, exceeded
the dividends by the sum of $8,674.32, of which sum
$5,776.05 was applied to repairs of the Farmers' and
Mechanics Building, hereinafter referred to, the balance
of said sum being added to surplus. In the year 1938 the
net income after deductions and depreciation amounted
to $5,850.66 and the dividend declared amounted to
$6,000. In the year 1939 the net income after deprecia-
tion and all deductions amounted to $3,467.23 and dur-
ing that year a dividend of $6,000 was declared. De-
preciation has been set up on the books of the corpora-
tion in the sum of $8,247.72 each year appellee has been
in office. As of the end of the year 1939 the total de-
preciation is set up on the books as $117,771.23 as
against fixed assets carried on the books in the sum of
$151,120.04. The corporation carries an investment
account which at the end of 1939 totaled $118,338.62. A
principal item in the investment account consists of 411
shares of the Chester County Building and Loan Asso-
ciation, carried on the books at its paid-in value,
$53,841.00, which shares of stock matured in December
1940 and in May 1941, in the sum of approximately

$82,000.00, against which there has been made a loan of $35,000.00." Appellants say further: "With the above figures in mind, it will be noted that many thousands of dollars earned by the corporation since the death of William H. Hodgson have not been declared as dividends and which at the time of appellee's appointment as substituted trustee approximated $65,000.00, conceding the depreciation figure to be fair." They also contend on this point as follows: "Disregarding the interests of the life tenants and well knowing that the funds received from the matured Building and Loan stock were not necessary to the financial stability of the newspaper corporation, appellee permitted the corporation to invest a large part of those funds in a building known as the Farmers and Mechanics Building; forty-seven thousand dollars of the corporation's money has been invested in that building, every dollar of which was earned during the life estates. It was not necessary to wait until the Building and Loan shares matured to ascertain the rights of the life tenants. If it was necessary, and a proper corporate move to expand the newspaper business by the purchase of the Farmers and Mechanics Building, appellee should have taken immediate steps to see that the life tenants were not discriminated against either by the declaration of a stock dividend or by some other means to protect their interests." As to this the court below said: "It is not believed that the above transaction constitutes a contributing cause for removal of respondent. Whether it was a wise business move or not we are not prepared to say. We do say however that we are not convinced that it was unwise to the extent that it shows that respondent is no longer fit to administer this trust."

Whether or not dividends should be declared in greater amounts than they have been is largely a question of business wisdom and policy and this question need not be determined by us in these proceedings. Such a question is one which in a trust like this should be

determined after full and frank discussion between the trustee and those who are the beneficiaries of the trust, if the latter are capable of discussing such a question. All three appellant-beneficiaries are adults and it is fair to assume that they have the interest of the trust estate at heart and would not wish the trustee to do anything that might be inimical to its permanent welfare. That the relationship existing between the trustee and the appellant-beneficiaries is such that makes impossible a full and fair discussion between them of matters of business policy, is a consideration which lends strong support to the contention of appellants that the appellee should be removed.

When a court is called upon to remove a trustee, "the question in each case is whether the circumstances are such that the continuance of the trustee in office would be detrimental to the trust": Scott on Trusts, sec. 107. If in the instant case the trustee exhibited unusual ability and exceptional qualities in the management of this trust these facts would weigh heavily in the scales against the wrong conduct proved against him as trustee, though neither such ability nor such qualities could excuse his conduct. We find nothing in this record to indicate that Kessler is indispensable to the proper management of this trust. Before being appointed trustee Kessler had been engaged in the real estate business in Philadelphia and it has not been shown that he has any special aptitude for the management of a newspaper. The newspaper profits disclosed by this record while creditable to the management do not indicate managerial skill of an extraordinary nature.

The offensive attitude Kessler exhibited to these appellants shortly after he was made trustee in response to their petition, his assumption of dictatorial airs as soon as he was intrusted with power, and his petty spitefulness and maliciousness toward Mrs. Thomas in causing her arrest for the larceny of a dozen sheets of stationery and three envelopes out of the newspaper plant she with

others had inherited from her grandfather, revealed Kessler's possession of qualities which one does not expect to find in men who claim to possess such executive ability as is required in the successful management of business properties. Kessler's "malicious prosecution" of Mrs. Thomas and his holding her up to public obloquy in the newspaper as being "charged with serious larceny" would naturally create ill-will against him in the community and affect adversely the newspaper he managed. It is shown in the record that Kessler "spends his winters in Florida". His extensive use of the hotel due bills also proves that this newspaper "carries on" during extensive periods of the year when Kessler is not personally "at the controls".

Our conclusion is that the bitter feelings existing between the trustee and the life tenants, which make all business or personal intercourse between them impossible is detrimental to the interests of the trust, and that the trustee committed breaches of his trust which no court can justly ignore or excuse.

The decree dismissing the bill is reversed at the cost of appellee, and it is directed that the record be remitted to the court below and that there an order and decree consistent with this opinion be made.