Fraiman Estate.

Argued April 30, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Morris Gerber*, with him *Kiefer Newman Gerstley*, and *Wisler, Pearlstine, Talone & Gerber*, for appellant.

*Alan Miles Ruben*, with him *William L. Huganir*, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, September 25, 1962:

Whether the court below abused its discretion (1) in allowing a $16,500 fee to counsel for services rendered in the settlement of a decedent's estate and (2) in refusing to remove a testamentary trustee are the questions presented on this appeal.

Charles Fraiman (decedent), a resident of Montgomery County, died testate on February 10, 1959. Under the terms of his will, the decedent, after making a $1000 bequest to an employee, created a trust of the entire residue of his estate under which, in perpetuity, the entire net income is to be paid to Yeshiva University in New York (Yeshiva). Benjamin Cohen, a close

friend of decedent, was named executor in the will and Attorney Melvin Rubin, the scrivener of the will, was named sole trustee and counsel for the executor.

Decedent's estate, inventoried at $282,000,[1] consisted of a scrap yard business, five parcels of real estate of which four were rent producing, several U. S. savings bonds, four bank and savings accounts and a claim against the Pennsylvania Turnpike Commission.

Mr. Rubin acted as counsel to the executor and handled the various matters connected with the settlement of the estate until March 1960 at which time, as the result of a disagreement between Mr. Rubin and the executor, the latter secured other counsel. In the meantime, Mr. Rubin had prepared, with the aid of an accountant,[2] a first and final account which the executor's new counsel filed in the Orphans' Court of Montgomery County. At the same time a supplemental account was filed which brought up to date the first and final account and particularly reflected the sale of all decedent's realty within a month after the executor's new counsel was secured.

Upon filing of the account, Mr. Rubin presented a claim in the amount of $28,200 for legal services rendered to the estate.[3] Both Yeshiva and the Attorney General of the Commonwealth[4] filed objections to the

---

[1] According to the adjudication of the auditing judge, the balance for distribution at the time of audit was $225,713.37, consisting of U. S. savings bonds valued at $945.30, U. S. Treasury bills valued at $29,808.90, a claim against the Pennsylvania Turnpike Commission, inventoried at $35,000 and cash.

[2] This accountant, according to the account, claimed $1100 for services rendered to the estate. Cf: statement in Yeshiva's brief that the accountant claimed $1250.

[3] This represented 10% of the gross value of the estate.

[4] After the court below reduced the amount of this fee the Attorney General apparently stepped out of the picture and is not a party in this appeal.

amount of this fee. The Attorney General also filed a petition for the substitution of a new trustee in place of Mr. Rubin to which Mr. Rubin filed preliminary objections. After the court sustained these preliminary objections the Attorney General did not press the matter further. Yeshiva, however, presented a petition to the court challenging distribution of the estate to Mr. Rubin as trustee and requesting Mr. Rubin's removal as trustee. After the taking of testimony, the court below reduced the requested counsel fee from $28,200 to $16,500[5] and refused to remove Mr. Rubin as trustee. From that decree this appeal was taken.

In passing upon the amount of counsel fee we bear in mind the well settled principle that: "Supervision of the amount of compensation is peculiarly within the discretion of the court below. Unless such discretion is clearly abused, the judgment will not be disturbed on appeal": *Faust Estate,* 364 Pa. 529, 530, 73 A. 2d 369. See also: *Bennett Estate,* 366 Pa. 232, 237, 238, 77 A. 2d 607; *Williamson Estate,* 368 Pa. 343, 357, 82 A. 2d 49; *Bickel Appeal,* 388 Pa. 270, 277, 130 A. 2d 498; *Taulane Estate,* 408 Pa. 19, 22, 23, 182 A. 2d 765. The question now before us is whether the court below abused its discretion in fixing Mr. Rubin's counsel fee at $16,500?

We start our examination of this record with the assumption, expressed by the court below, that Mr. Rubin, during the time he was counsel to the executor of this estate, exhibited "diligence and industry" and "did a thorough and competent job". Such adherence to the conduct fully expected of every counsel for an estate justifies commendation but it does not justify an unfair or unjust fee. That the original fee claimed by Mr. Rubin in the amount of $28,200 was exorbitant is

---

[5] Approximately 5.7% of the value of the gross estate and slightly in excess of 7% of the distributable estate.

446

clear beyond any question and the court below very properly rejected the amount of the fee claimed. Our inquiry is whether the court below *sufficiently* reduced the fee.

In justification of his fee, Mr. Rubin testified to the services which he rendered in the settlement of this estate and presented to the court a memorandum consisting of 66 typewritten pages, single spaced and of legal size. On this memorandum were noted letters written, conferences, phone calls, etc., all purporting to show that Mr. Rubin spent between 1500 and 2000 hours in the settlement of this estate. In respect to this we are in full agreement with the statement of the court below: ". . . this court gave much consideration to the inexperience of counsel in setting the fee. The following language is used . . . [in the] adjudication. 'A more experienced attorney could have accomplished a similar result in much less time. The hours spent by Mr. Rubin therefore have not overimpressed the court on setting the fee but the court commends Mr. Rubin for his diligence and industry.' The evidence indicates that Mr. Rubin spent much time conferring with other attorneys seeking advice which would have been unnecessary to a more experienced attorney. For this reason, this court refused to place very much weight on the testimony of Mr. Rubin to the effect that he spent between 1500 and 2000 hours in administering the estate. Although the auditing judge commended Mr. Rubin for his diligence and industry, no compensation was allowed for time spent 'learning his job'."

The instant record presents *in great detail* all the services which Mr. Rubin claims to have rendered and the problems involved in settlement of this estate. So far as decedent's realty was concerned it appears that Mr. Rubin performed duties which would ordinarily be performed by the personal representative, rather than the counsel, of an estate and that he collected the

rents, arranged for maintenance and repair and generally managed the realty. While he did make some efforts to sell the realty, such efforts, as reflected by the record, were not as effective as they might have been. At the time of decedent's death he had employed Joseph K. Fornance, Esq. to handle a claim against the Pennsylvania Turnpike Commission and in that proceeding a board of view made an award to decedent of $40,800 which had been reduced on appeal by the Commission to $35,000. This matter was being handled by competent counsel, chosen by the decedent, and it is very difficult to understand the necessity for Mr. Rubin to consult with "specialists in the condemnation field to determine the best course of action in regard to this matter" as he claims to have done. The closing of the bank accounts and the sale of the U. S. savings bonds presented no unusual or extraordinary problem and are matters common in the settlement of most estates. As to the scrap business it appears that, largely through Mr. Rubin's efforts, a sale was effected for $25,090, "a highly beneficial result" as the court below termed it. Outside of the scrap business sale and perhaps the preparation of an opinion in construction of the will, *our* scrutiny of this record reveals nothing in the services rendered or the problems involved of such unusual nature as to justify an unusually high fee.

Both Yeshiva and Mr. Rubin presented the testimony of members of the bar in support of their positions. J. T. Coghlan, Jr., a member of the Philadelphia bar for approximately 30 years, testified that the services rendered by Mr. Rubin were, in part, both those of an executor and counsel and that, in his opinion, a fee of $28,200 was reasonable under the circumstances of this estate. W. F. Fox, a member of the Montgomery County bar for upwards of 25 years, testified that in his opinion the administration of this estate was routine, except for the opinion in construction

of the will,[6] and that a $10,000 fee would be reasonable. S. H. High, a member of the Montgomery County bar for 29 years, testified that, in his opinion, a $7500 fee would be reasonable.[7]

The court below which sees and hears the witnesses ordinarily is in a much better position to pass on their credibility than an appellate court. However, in the case at bar, insofar as the services rendered and other factors in fixing compensation are concerned, no question of credibility arises; assuming that Mr. Rubin did all that he stated he did and that the settlement of the estate involved all the problems outlined by him, what is the fair amount of the fee to which he is entitled? In fixing a fee for counsel for an estate certain factors must be considered: the services rendered, including consideration of the nature and difficulty of any problems involved, the responsibility incurred, the time expended, the size of the estate, the general experience of counsel, etc. Cf: *Williamson Estate*, supra, p. 357. All these factors are portrayed with such great clarity on this record that the result is that this Court is in the same position as the court below to evaluate a proper fee based on such factors.

We have carefully examined this voluminous record and from such examination we are satisfied that, with the possible exception of the services rendered by Mr. Rubin in connection with the sale of the scrap iron business and in the construction of the will for Yeshiva,

---

[6] At Yeshiva's request, Mr. Rubin was called upon to give an opinion whether he could declare the existence of an inter vivos gift of the scrap yard party to Yeshiva, whether on the ground of promissory estoppel this property might be given outright to Yeshiva and whether the trust might be declared a dry trust.

[7] Under the Montgomery County Minimum Fee Schedule the minimum fee in an estate having a gross value of $280,000 would be approximately $6900. All parties appear to agree with the court below that this was not a "minimum fee estate".

the services rendered, the responsibility involved and the problems which arose were neither unusual or extraordinary but routine in nature. In our view, a $16,500 fee cannot be justified on the factual situation presented by this record and the court below abused its discretion in fixing Mr. Rubin's fee at that figure. Giving full consideration to all the factors necessarily involved in fixing Mr. Rubin's compensation we are of the opinion that the maximum fee to which he is entitled is $14000 and, to that end, the decree of the court below must be modified.

In passing upon the propriety of that portion of the decree which refused to remove Mr. Rubin as trustee two principles of law must guide us: In the first place, the "removal of a trustee is a drastic action, which should only be taken when the estate is actually endangered and intervention is necessary to save trust property". (*Mathues's Estate*, 322 Pa. 358, 359, 185 A. 768; *Crawford's Estate*, 340 Pa. 187, 190, 16 A. 2d 521; *Corr Estate*, 358 Pa. 591, 598, 58 A. 2d 347) and particularly is this true in the case of a trustee selected by a testator, as opposed to a court selected trustee, (*Neafie's Estate*, 199 Pa. 307, 312, 313, 49 A. 129; *Bailey's Estate*, 306 Pa. 334, 337, 159 A. 549; *Corr Estate*, supra); in the second place, the removal of a trustee is a matter which lies in the discretion of the court below and, in the absence of an abuse of discretion, that court's action will not be disturbed: *Crawford's Estate*, supra; *Corr Estate*, supra.

In this Commonwealth the removal of a trustee is governed by the Fiduciaries Act of April 18, 1949, P. L. 512, 20 P.S. §320.101 et seq. Section 921 of that Act (20 P.S. §320.921) provides that the grounds for the removal of a trustee are those set forth in Section 331 of the Act (20 P.S. §320.331). The only statutory ground presently pertinent is that which gives the court the power to remove a trustee "(5) when for any other rea-

son, the interests of the estate are likely to be jeopardized by his continuance in office."

Yeshiva, as cestui que trust, seeks the removal of Mr. Rubin, the trustee, upon the ground that an acrimonious and hostile relationship, which is the fault of the trustee, exists between the trustee and Yeshiva. In *Price's Estate*, 209 Pa. 210, 212, 58 A. 280, we stated: "While inharmonious relations between trustee and cestui que trust, not altogether the fault of the former, will not generally be considered a sufficient cause for removal, yet where they have reached so acrimonious a condition as to make any personal intercourse impossible and to hinder the proper transaction of business between the parties, a due regard for the interests of the estate and the rights of the cestui que trust may require a change of trustee." See also: *Hodgson's Estate*, 342 Pa. 250, 257, 20 A. 2d 294; *Corr Estate*, supra.

Until November 1959, apparently, both the trustee and Yeshiva were on good terms. At that time, Mr. Rubin asked Yeshiva's counsel what price Yeshiva would consider acceptable for the Fraiman property on Old York Road, Montgomery County and Yeshiva's counsel, by letter, advised Mr. Rubin that $100,000 would be acceptable. In response to this letter Mr. Rubin wrote a letter to Yeshiva's counsel in which he, *somewhat peremptorily,* advised that, while he appreciated Yeshiva giving its views, after all it was up to him, not Yeshiva, to set the price. The tone of this letter and the attitude exhibited therein by Mr. Rubin seem to have injured the prior good relationship between the parties. A short time later, Yeshiva's counsel requested the right to examine (a) books and records kept by decedent prior to his death and (b) books and records of the estate. Mr. Rubin replied that the former were being audited by the Internal Revenue agents and the latter were being used to prepare the final account, hence all were presently unavailable.

After Yeshiva's counsel had written Mr. Rubin, terming the reasons assigned for not opening the books and records for examination "poor excuses", a meeting was finally arranged at which such books and records were examined. This incident served to widen the breach between the parties. Furthermore, after the executor secured other counsel and decedent's real estate had been sold, Mr. Rubin, as trustee, sought to surcharge the executor for having sold the realty for approximately $20,000 less than the inventory value. These are the incidents, together with the size of the counsel fee claimed by Mr. Rubin, which furnish the background for the present unhappy relationship between the parties. While these incidents could well have been avoided had Mr. Rubin exhibited more tact and diplomacy in his dealings with Yeshiva, we agree with the court below that the relationship as it now exists between the parties is not such as to justify the removal of Mr. Rubin as trustee.

In *Carrier v. Carrier*, 226 N. Y. 114, 123 N.E. 135, Judge CARDOZO stated: "The power to remove includes the power to impose the terms upon which removal will be refused." In line with that power we suggest that the relationship between this trustee and Yeshiva must be maintained on such a basis that the interests of this trust will not be jeopardized or the interests of Yeshiva threatened. If any future conduct *on the part of the trustee* leads to acrimony between the parties which threatens this trust or the interests of the cestui que trust then a new petition may well be presented for the removal of the trustee. Personal animosity between this trustee and the beneficiary will not be permitted to thwart the decedent's aim and purpose in the creation of this trust.[8]

---

[8] Our attention has been directed to a letter written by the trustee to Yeshiva intimating that the net income from the trust

452

Decree, as modified, affirmed.   Costs on the estate.

might be limited to use for scholarships for deserving students. If this was intended as a threat to Yeshiva the trustee was ill-advised in writing this letter.