401 A.2d 737

In re ESTATE of Walter H. BAKER, Deceased, Fourth and Final Account of William G. Stewart, Successor Individual Trustee, and the Union National Bank of Pittsburgh, Surviving Trustee, under the trust for Wilma L. Baker, Deceased, now Garrett B. LeVan, succeeding life tenant under Paragraph Sixth (C).

APPEAL of Garrett J. LeVAN, Peter H. LeVan, Andrea LeVan Kinney and Katharine LeVan Aspen.

Supreme Court of Pennsylvania.

May 30, 1979.

James H. McCune, Washington, James W. Frey, Hoppe, Frey, Hewitt & Milligan, Warren, Ohio, pro hac vice, for appellant.

Robert F. Patton, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION

NIX, Justice.

The single issue presented by this appeal[1] is whether the chancellor's award of counsel fees to attorneys for the corporate trustee of a testamentary trust was in such an amount as to constitute abuse of discretion by the chancellor. We find no abuse of discretion and, therefore, affirm the decree.

As set forth by the chancellor, the factual background of the testamentary trust which appellee represented is as follows: Walter Baker died on June 26, 1947, and by the terms of his will he created a testamentary trust for his second wife, Wilma L. Baker. The trust was to be administered by The Union National Bank of Pittsburgh (the corpo-

---

1. Jurisdiction over this appeal is vested in this Court by section 722(3) of the Judicial Code, 42 Pa.C.S.A., section 722(3) (1978 Pamphlet—Part I).

rate trustee) and an individual named Edward L. Stockdale.[2] The trust was to continue during the lifetime of Mrs. Baker, who died on May 4, 1963, and then for the life of her son by a previous marriage, Garrett B. LeVan. At Mr. LeVan's death on February 16, 1976, the trust corpus was to be distributed to his issue, per stirpes, (namely his four children, all of whom survived him).

At the time that assets were transferred from Mr. Baker's estate to the trustee on December 18, 1950 (the starting date of the trust's administration), their value was approximately $1,041,000.00. At the termination of said trust, on February 16, 1976, the assets were valued at approximately $2,090,-000.00, or an increase in market value of approximately $1,050,000.00. Over the approximately twenty-five years of the trust's administration, it generated over two million dollars in income.

Upon the death of Mr. LeVan, the trustees filed the fourth and final account and an audit of the same was held before the chancellor on May 17, 1976. Shown in this account as chargeable against the trust's principal was a fee balance due the trustees' attorney, appellee, in the amount of $34,800.00. The remaindermen appellants, (children of Garrett B. LeVan) filed exceptions to the proposed schedule of distribution stating that the attorney's fees were excessively high, and further amended exceptions were filed alleging, inter alia, that the attorney for the trustees had been compensated previously for services rendered. After an evidentiary hearing, the entry of a decree nisi, and consideration and denial of exceptions to that decree, the chancellor entered a final decree awarding $32,255.47 to appellee for legal services rendered to the trust during its duration.

 As to the propriety of the amount of a chancellor's or auditing judge's award of counsel fees, our scope of review is narrow:

2. Mr. William G. Stewart is now the individual trustee, having succeeded Mr. Stockdale upon the latter's death in 1969.

In passing upon the amount of counsel fee we bear in mind the well settled principle that: " 'Supervision of the amount of compensation is peculiarly within the discretion of the court below. Unless such discretion is clearly abused, the judgment will not be disturbed on appeal.' " *Browarsky Estate,* 437 Pa. 282, 285–86, 263 A.2d 365 (1970), *quoting Faust Estate,* 364 Pa. 529, 530, 73 A.2d 369 (1950); *see Fraiman Estate,* 408 Pa. 442, 445, 184 A.2d 494 (1962).

So long as the lower court's award is based upon those factors relevant to a determination of counsel fees,[3] *see LaRocca Estate,* 431 Pa. 542, 546, 246 A.2d 337 (1968), and the findings of fact underlying the amount of the award have evidentiary support, an appellate court will not overturn a chancellor's determination of the amount of legal fees awarded. *See Bennett Estate,* 366 Pa. 232, 237, 77 A.2d 607 (1951).

With respect to the nature and extent of the legal services provided by appellee over the term of the testamentary trust, the chancellor made the following findings of fact:

(a) advising the trustees as to their authority to make discretionary distributions of principal to trust beneficiaries;

(b) advising the trustees as to prudent investments including advice as to specific investment;

(c) advising the trustees on the collection of secured promissory notes held in the trust;

(d) the review of each of the four accounts of the trustees, the preparation of all necessary legal documents and appearances in court in connection with the audits of the accounts;

(e) representation of the trustees in litigation in West Virginia concerning coal lands;

(f) In addition to services normally provided to a trustee by counsel for the trust fund, counsel was required to advise the corporate trustee on a number of complex

---

**3.** *See also* Code of Professional Responsibility, Ethical Consideration 2–18; Disciplinary Rule 2–106(B).

issues concerning the diversification of investments, particularly the liquidation of the large position in Universal Cyclops stock and the reinvestment of proceeds in common stocks and municipal bonds. These extraordinary services included: a request by Emory R. Kyle in 1956 for a "no-action" letter from the Securities and Exchange Commission, including, inter alia, a written opinion of counsel to the Commission that the trustees of this trust, either alone or in concert with others, did not control the issuer and were not controlled by it, and that the shares of the issuer's common stock could be sold to the public through brokers and dealers without registration under the Securities Act of 1933; the preparation, in conjunction with the company, of a registration statement; and the continuing consultation of and advice of counsel with respect to the sale of Universal Cyclops stock in accordance with SEC Rule 154. The special services rendered in connection with the sales of Universal Cyclops stock involved a high degree of professional risk to counsel because of the potential liability of its clients in the event of any violation of the securities laws.

We have reviewed the entire transcript and have concluded that there is ample evidentiary support for these findings.

In setting the amount of the award, the chancellor made specific findings under each of the factors set forth in *LaRocca Estate, supra:*

1. *The amount of work involved* —the trust was under administration for over twenty-five years.

2. *The character of the services rendered* —the trust was initially funded with substantial holdings in the family related company, Universal Cyclops Corporation, which became the subject of various complex compliance actions before the Securities and Exchange Commission as a result of the requirements of trust beneficiaries and the trustees to diversify the trust portfolio.

3. *The difficulty of the problems involved* —in addition to the normal duties assumed by counsel for the trust during its period of administration, the investment compo-

sition of this trust demanded extraordinary attention on the part of counsel, particularly in the area of the federal securities laws.

4. *The amount of money or value of the property in question, . . . and very importantly, the amount of money or the value of the property in question*—the trust, which began with some $1,041,000.00 of assets in 1950, and over the course of administration grew to a value, at the death of Garrett B. LeVan, in excess of $2,000,000.

5. *Experience, ability and reputation of the attorneys involved*—the services of counsel for the trustees were all performed by partners in the firm who were experienced and able in the areas of securities regulations and trust administration.

*See* id., 431 Pa. at 546, 246 A.2d 339.

Additionally, the chancellor heard testimony from a local attorney who specialized in trust practice; the attorney testified that under all the circumstances, the amount of the fee claimed by appellee was reasonable.[4] Our independent review of the record leads us to concur in the opinion that the balance claimed ($34,800) in legal fees is reasonable. The evidence indicates that appellee provided somewhat in excess of four hundred hours of legal services; the total amount ($34,800.00 plus $6,410.53) thus represents an hourly rate of approximately $100.00 per hour, or an annual retainer of slightly less than $1,650.00. In light of the complexity of some of the legal matters and the interests involved, such charges are not unwarranted.

Appellants contend that the chancellor found that a payment by the corporate trustee to appellee in 1958 of

---

4. Appellants offered no evidence to contradict that presented by appellee on the reasonableness of the amount of the fee claimed. One of appellants' counsel did put his co-counsel on the stand to testify as to the difficulty encountered by counsel for appellants in finding an expert to testify against appellees. The testimony of co-counsel indicated that several officers of local banks were notified, but not one would consent to testify for appellants. The relevance of co-counsel's testimony on this point is not readily apparent to us. Appellants do not expressly allege collusion and we find no basis for inferring its existence.

$2,544.53 constituted full payment for the legal services rendered by appellee in connection with the trust's divestiture of Universal Cyclops stock. From this contention, appellants then argue that because this securities matter was by far the most difficult issue confronted by appellee during its representation of the trust, the remaining services rendered by appellee were routine and thus not significant enough to support an award of over thirty thousand dollars in counsel fees. The simple response to this argument is that appellants have misread the record and the opinion sur exception, which, taken together, make it clear that the 1958 disbursement to appellee (as well as similar disbursements in 1970 and 1976) was an interim *partial* payment, in no way intended to constitute *full* compensation for legal services rendered to the date of the disbursements. Resting, as it does, upon an erroneous premise, appellant's argument must fail.

We therefore affirm the decree of the chancellor of the Court of Common Pleas of Washington County.

Each party to pay own costs.