

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-7-1999

# Dardovitch v. Haltzman

Precedential or Non-Precedential:

Docket 98-1421, 98-1422, 98-1452

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Dardovitch v. Haltzman" (1999). *1999 Decisions.* Paper 250.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/250

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 7, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 98-1421, 98-1422, and 98-1452

NICK DARDOVITCH

v.

MARK S. HALTZMAN, ESQUIRE; CATHERINE A. BACKOS,
as trustees of GLENN EAGLE SQUARE EQUITY ASSOC.
TRUST; GLENN EAGLE SQUARE EQUITY
ASSOCIATES, INC.

      Mark S. Haltzman,
      Appellant in No. 98-1421

NICK DARDOVITCH

v.

MARK S. HALTZMAN, ESQUIRE; CATHERINE A. BACKOS,
as trustees of GLENN EAGLE SQUARE EQUITY ASSOC.
TRUST; GLENN EAGLE SQUARE EQUITY
ASSOCIATES, INC.

      Mark S. Haltzman,
      Appellant in No. 98-1422

NICK DARDOVITCH
      Appellant in No. 98-1452

v.

MARK S. HALTZMAN, ESQUIRE; CATHERINE A. BACKOS,
as trustees of GLENN EAGLE SQUARE EQUITY ASSOC.
TRUST; GLENN EAGLE SQUARE EQUITY
ASSOCIATES, INC.

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 97-cv-00052)
District Judge: Honorable Stewart Dalzell

Argued: January 28, 1999

Before: BECKER, Chief Judge, SCIRICA and ROSENN
Circuit Judges.

(Filed: September 7, 1999)

JOSEPH M. DONLEY, ESQUIRE
 (ARGUED)
PATRICK W. KITTREDGE, ESQUIRE
GLENN E. DAVIS, ESQUIRE
Kittredge, Donley, Elson, Fullem
 & Embrick
421 Chestnut Street, 5th Floor
Philadelphia, PA 19106

Counsel for Mark S. Haltzman

CLETUS P. LYMAN, ESQUIRE
 (ARGUED)
MICHAEL S. FETTNER, ESQUIRE
Lyman & Ash
1612 Latimer Street
Philadelphia, PA 19103

Counsel for Nick Dardovitch

STEVEN R. SPARKS, ESQUIRE
 (ARGUED)
Eckell, Sparks, Levy, Auerbach
 & Monte
A Professional Corporation
344 West Front Street
Media, PA 19063

Counsel for Catherine A. Backos, as
trustees of Glenn Eagle Square
Equity Associates Trust and Glenn
Eagle Square Equity Associates, Inc.

OPINION OF THE COURT

BECKER, Chief Judge.

These cross-appeals present interesting questions concerning the amount-in-controversy requirement for diversity jurisdiction, the extent to which an attorney holding a contingent-fee agreement may charge additional fees for collecting the proceeds of a settlement or judgment, and the proper administration of trusts by trustees and the beneficiaries' remedies for errors therein under Pennsylvania law. The principal appellant is defendant Mark S. Haltzman, a member of the Pennsylvania bar and a trustee of the Glen Eagle Square Equity Associates Trust (the "Trust"). Haltzman successfully represented Catherine A. Backos, a codefendant and co trustee, in a separate civil RICO claim brought by her and Glen Eagle Square Equity Associates ("GESEA"), in which she was a major shareholder, on a contingent fee basis. In order to administer and distribute the proceeds of settlement of the RICO claim, Haltzman and Backos established the Trust, naming themselves as trustees. There were numerous beneficiaries, including two shareholders and creditors of GESEA -- Nick Dardovitch, the plaintiff and cross-appellant, and Backos -- and also Haltzman himself, whose interest sprang from his contingent fee. As part of his efforts in administering the Trust, Haltzman took steps to collect on the notes that constituted the trust corpus. He paid himself an attorney's fee for this action out of the

3

Trust's funds, and this case centers on the propriety of Haltzman's acceptance of these additional fees.

As always, the threshold question is one of jurisdiction. Dardovitch alleged, and the District Court found, that his claim fell within the District Court's diversity jurisdiction. Haltzman argues that this subject-matter jurisdiction is lacking because Dardovitch's claim fails to meet the amount-in-controversy requirement. Haltzman contends that the amount in controversy is determined by payments presently due. That is ordinarily the case. But where, as here, the plaintiff had good cause to believe that he needed to bring suit to establish his right to receive any funds under the trust, the entire amount of the plaintiff 's interest in the trust can become the amount in controversy. Since this amount substantially exceeded the jurisdictional amount, the District Court had subject-matter jurisdiction.

Both Haltzman and Dardovitch raise numerous issues relating to the District Court's decision on the merits. The central issue is whether an attorney who enters into a contingent-fee agreement that is not specific on the point is entitled to additional fees for collecting the proceeds of the settlement or judgment. The District Court concluded that Haltzman's fee under the original contingent fee agreement included both his actions in securing a settlement and any steps necessary to collect the proceeds of the settlement, and that he was therefore not entitled to additional fees for the collection actions. The District Court thus held that Haltzman had breached his fiduciary duty to the Trust by accepting legal fees for collecting on the notes that were the Trust's sole assets.

Haltzman challenges this reading of the Trust and contingent fee agreement, arguing that they were limited to his prosecution of the action to judgment, and did not include his collection efforts. In analyzing the fee agreement, the District Court looked at a variety of factors, including the fact that Haltzman himself drafted the agreement; the terms of the agreement; and the general understanding of contingent-fee agreements. It also considered, but rejected as self-serving, Backos's testimony concerning her intent in entering into the agreement. We conclude that the District Court's findings of fact and

4

conclusions of law as to the meaning of the retainer agreement and the Trust must be upheld.

Haltzman also challenges the District Court's award of attorney's fees to Dardovitch. The court ordered Haltzman to pay part of Dardovitch's attorney's fees based on general equitable principles applicable in trust cases. Without holding a hearing, the court ordered Haltzman to pay most of Dardovitch's accrued fees from the beginning of the suit until the court granted Dardovitch partial summary judgment and ordered an accounting. This award was based on the conclusion that most of this work was necessitated by Haltzman's continued refusal to admit that Dardovitch was a beneficiary of the Trust. The court also ordered Haltzman to pay one-quarter of the fees Dardovitch had paid for his attorneys' work subsequent to the accounting. This latter award was based on the fact that some of Dardovitch's objections to Haltzman and Backos's accounting were sustained, although many were not.

We agree with the general propriety of directing Haltzman to pay Dardovitch's fees. However, because the District Court held no hearing, did not adequately explain the basis of its fee calculation, and in particular did not sufficiently tie the award to the factors warranting the award, we will vacate the district court's order and remand with instructions to hold a hearing to recalculate the attorney's fee award based on the reasonableness of the claimed fees. On remand, the court should examine the claims carefully to ensure that the claimed fees are sufficiently related to the justifications for the fee award.

In his cross-appeal, Dardovitch challenges the District Court's conclusion that Backos should not be jointly liable for Haltzman's breach of his fiduciary duty. The District Court relieved Backos of liability because it concluded that she relied on Haltzman to such an extent in legal matters that his breach cannot fairly be attributed to her. Under Pennsylvania law, a trustee is obligated to exercise reasonable care to ensure that her co-trustees do not breach their fiduciary duties. A trustee who breaches this duty may become jointly liable for the breaches of the co-trustee. Furthermore, reliance on the advice of counsel is only one factor to be considered in determining whether a

5

trustee acted reasonably, and even then the reliance itself must be reasonable. The Court's decision, which seems to have applied at most a subjective reasonableness standard, appears to be contrary to the objective reasonableness standard of Pennsylvania law. Accordingly, we will vacate the District Court's order and remand Dardovitch's claim against Backos so that the court can evaluate her liability under the correct standard, i.e., whether she exercised reasonable care to ensure that Haltzman did not breach his fiduciary duty. The orders of the District Court will thus be affirmed in part and vacated in part, and the case remanded for further proceedings consistent with this opinion.

I. Facts and Procedural History

This case originated in the settlement of a civil RICO suit brought by Backos and GESEA. GESEA was organized to purchase and operate a shopping center. Its shareholders included Backos (55%), Dardovitch (15%) and two of Backos's siblings (15% each). GESEA obtained commitments from various financing companies, but these firms backed away from their commitments. As a result, the shopping center was sold to another entity, and in 1993 Backos and GESEA filed a civil RICO suit against the various financing companies. This suit was the sole business of GESEA at that time and subsequently. Backos retained Haltzman to represent her and GESEA. Haltzman initially proposed that he would do the work for a 30% contingent fee plus expenses to be paid promptly, with a retainer which was paid up front. See App. at 1774-77. In May 1993, GESEA adopted a shareholder resolution providing that Haltzman's fee, including expenses, would be capped at 30% of the recovery. See App. at 1530-34. This shareholder resolution was subsequently amended in August 1993 to reflect that the fee was to be a 30% contingent fee, not including expenses.

In January 1994, when Backos was unable to keep current with her payments to Haltzman for litigation expenses, the representation agreement was again amended to provide a priority for Haltzman in the proceeds of the litigation. See App. at 1778-79. Under the amended

agreement, Haltzman was to receive the entire first $150,000 of any sums received as a result of the litigation; Backos and GESEA were to receive the next $150,000; and Haltzman was to be entitled to 30% of the next $1.7 million and 15% of any recovery over $2 million. Shortly thereafter, the suit settled for $994,000. The settlement agreement provided that Backos and GESEA would be paid via long-term, non-interest-bearing notes in this amount.

Apparently out of concern that GESEA's creditors would immediately claim all of the money, Backos and GESEA set up a trust -- the GESEA Trust -- for the receipt and distribution of the proceeds of the settlement. Haltzman and Backos were named trustees. The proceeds were to be distributed in accordance with the representation agreement, along with certain payments to GESEA's creditors. The remaining money due GESEA was to be distributed to the shareholders in proportion to their interests. See App. at 1574-79. Dardovitch's share of the $994,000 settlement was $104,000, although it was only due and payable as the Trust received it. Prior to the filing of the complaint in this case, Haltzman informed Dardovitch by letter that only about $30,000 was due to him at that time.

It became clear after the settlement that it would be difficult to collect on the notes. Accordingly, Haltzman took legal measures. See, e.g., Glen Eagle Square Equity Assocs. Trust v. DSL Capital Corp., No. CIV. A. 95-7939, 1996 WL 689113 (E.D. Pa. Nov. 26, 1996) (entering judgment in favor of plaintiff on action confessing judgment on one of the aforementioned promissory notes). Ultimately, Haltzman conducted work for which he billed the Trust approximately $63,000 on an hourly basis. As of May 1997, the Trust had received $335,000, of which $172,000 was paid out as legal fees and $44,000 as litigation costs, to Haltzman. Thus, 64.5% of the money thus far received has gone to pay legal fees and costs.

Although Dardovitch was informed of the creation of the Trust and received a copy of the distribution schedule of funds from it, he received little additional information from Haltzman or Backos concerning the status or nature of the Trust. Accordingly, he asked them about the income and

7

expenditures of the Trust in order to determine whether they were managing it properly, and whether any money was due him. Haltzman and Backos, however, gave him no information; indeed, by August 1996, Dardovitch still had not received any information on or money from the Trust. Although Backos subsequently provided him with some information, it was incomplete and inaccurate, and Dardovitch again requested information from Haltzman.

Haltzman finally responded on December 10, 1996, by sending a letter containing the following language to Dardovitch's lawyer:

> Please be advised that Nick Dardovitch is not a beneficiary of the Trust Agreement, as the beneficiaries of the Trust are Glen Eagle Square Equity Associates, Inc. and Catherine Backos. Accordingly, even if the information you requested in your letter was appropriate (which it is not), he is not entitled to an accounting. Further, the Trust document itself does not require that the Trustee provide an accounting to the beneficiaries.
>
> Please also be advised that Mr. Dardovitch has, in the past, acted detrimentally to the best interests of Glen Eagle Square Equity Associates, Inc. I suggest that Mr. Dardovitch consider his prior action and his possible liability as to same before he elects to take actions which will expose himself to potential liability.
>
> Please be further advised that to the extent that your office decides to bring litigation, which would be improper based on the fact that Mr. Dardovitch is not a beneficiary of the Trust, the Trust will seek to hold your firm, as well as Mr. Dardovitch, liable for all of its costs and expenses and will seek damages for malicious prosecution and abuse of process. Your letter is apparently a continuation of Mr. Dardovitch's past guerilla tactics in attempting to extort money to which he was not entitled.

App. at 58 (emphasis added).

On January 6, 1997, Dardovitch filed suit against Haltzman, Backos, and the Trust for amounts due him and

8

for an accounting. Haltzman and Backos defended by challenging jurisdiction and denying that Dardovitch was a beneficiary of the Trust. The District Court initially determined that it had subject-matter jurisdiction, see App. at 84-85, and that Haltzman was not entitled to a jury trial, see App. at 820. It then granted partial summary judgment in favor of Dardovitch, concluding that he was clearly a beneficiary, and ordered an accounting. See Dist. Ct. Order, App. at 812-19.

Dardovitch then challenged certain aspects of the accounting, and the Court held a hearing. See Dardovitch v. Haltzman, Civ. A. No. 97-52, 1998 WL 13271 (E.D. Pa. Jan. 13, 1998). The Court concluded that Dardovitch could not challenge pre-Trust transactions, see 1998 WL 13271, at *2-*3, and that Backos had not breached her fiduciary duty, see 1998 WL 13271, at *8 n.28. It also found that Haltzman had breached his fiduciary duty by claiming attorney's fees for the collection costs, and ordered him to refund the fees to the Trust. See 1998 WL 13271, at *4-*7. Because of certain setoffs, however, the Court ultimately found that Haltzman had to pay about $14,000 back to the Trust. See Appellant's Brf. App. 2, at 6-7. The District Court also ordered Haltzman to pay most of Dardovitch's attorney's fees from before the accounting, as well as one-quarter of his post-Accounting fees, for a total of approximately $64,000. See Appellant's Brf. App. 1.

Haltzman appeals from the District Court's orders making a variety of challenges, some of which we dispose of summarily in the margin. In particular, he challenges the District Court's decisions finding subject-matter jurisdiction, denying his request for a jury trial; 1 imposition

_____

1. We agree with the District Court that Haltzman was not entitled to a jury trial with respect to the accounting. A party ordinarily does not have
a right to a jury trial in an equitable proceeding. The Supreme Court has recognized that an accounting must be tried to a jury in certain circumstances, i.e., where the accounting is sought merely because of the complicated nature of the accounts, or where the accounting is ancillary to an equitable claim and is in essence a claim for repayment of a debt. See Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962) (holding that an accounting must be tried to a jury where it is in actuality a claim

of a surcharge on him;2 and awarding Dardovitch attorney's
fees. Dardovitch cross-appeals, challenging the District
Court's denial of his claims regarding pre-Trust transactions,3

_____

for repayment of a debt); 9 Charles Alan Wright & Arthur R. Miller,
Federal Practice & Procedure S 2310, at 87-91 (2d ed. 1994). Where the
duty to account is itself equitable, however, no right to a jury trial
arises.
See United States v. Louisiana, 339 U.S. 699, 706 (1950) ("The Seventh
Amendment . . . [is] applicable only to actions at law," not "an equity
action for an injunction and accounting." (citation and footnote
omitted));
9 Wright & Miller, supra, S 2310, at 90. An action for an accounting of
a trust is quintessentially equitable. See Restatement (Second) of Trusts
S 197 (all remedies of a beneficiary against a trustee are equitable,
except
for a claim for money immediately and unconditionally due to the
beneficiary or a claim to transfer chattel that the trustee is under an
immediate and unconditional duty to transfer to the beneficiary).
Accordingly, a party to a trust accounting has no right to a jury trial;
that is the situation here.

2. Haltzman challenges several aspects of the District Court's calculation
of the amount of the surcharge he had to pay, in addition to his
challenge to the District Court's conclusion that he was not entitled to
additional hourly fees for the collection actions. We find no error in the
District Court's reasoning rejecting these claims. See Dist. Ct. Order,
Appellant's Brf. App. 2, at 4 n.2, 5 & n.3.

Dardovitch challenges different aspects of the District Court's
calculation of the surcharge. He argues that the District Court erred in
allowing Haltzman to receive attorney's fees from the Trust for litigation
against the Hanaway group of creditors. In particular, he contends that
Haltzman should not be permitted to recover these fees from the Trust
because his actions in defense of the Hanaway's claims were in breach
of his fiduciary duty to the Trust. The District Court rejected
Dardovitch's objection to this payment, concluding that Haltzman's work
was, in this case, not covered by the contingent fee agreement and
resulted in a benefit to the Trust. See App. at 1398-99; Appellant's Brf.
App. 2, at 5-6. We see no clear error in the District Court's conclusion,
and will affirm its order on this point.

3. In his cross-appeal, Dardovitch disputes inter alia the District
Court's
conclusion that he has no standing to challenge certain actions Backos
and Haltzman took before the Trust was executed and, in any case, that
the challenge was barred by laches. Dardovitch contends that Backos
and Haltzman breached their duties to the other shareholders of GESEA
by entering into the contingent-fee agreement. The District Court held
that Dardovitch lacked standing as either a shareholder -- since he did

and Backos's own conduct and potential liability for the surcharge. Since this is a diversity case arising in the Commonwealth of Pennsylvania, we apply Pennsylvania law.

## II. Subject-Matter Jurisdiction

Dardovitch brought his claim under the District Court's diversity jurisdiction. See 28 U.S.C. S 1332.4 Dardovitch

_____

not bring a proper shareholder derivative suit -- or a beneficiary of the Trust -- since the Trust had not yet taken effect. Dardovitch now argues that he has standing to challenge the pre-Trust transactions as a creditor of GESEA under either the "trust fund doctrine" or the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Cons. Stat. SS 5101-10 (1998 Supp.) (applicable to transactions after February 1, 1994), and the Pennsylvania Uniform Fraudulent Transfer Act, 39 Pa. Cons. Stat. SS 351-63 (repealed 1993) (applicable to transactions before that date) [hereinafter collectively "PUFT/CA"]. Neither of these applies to this case, however. The "trust fund doctrine" makes the creditors of a corporation the beneficiaries of a trust consisting of the corporate assets, but only after a court order creating the trust, which did not occur in this case. PUFT/CA only applies to certain kinds of transactions, and only prohibits them if they are not for fair consideration and will render the corporation insolvent. See 12 Pa. Cons. Stat. SS 5101, 5105. Since the transactions that Dardovitch challenges do not meet some or all of these requirements, he cannot challenge them under PUFT/CA either. Accordingly, we will affirm the District Court's rejection of Dardovitch's objections to pre-Trust transactions. We need not and do not decide whether the District Court erred in concluding that Dardovitch was barred from asserting these challenges by laches.

4. "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum of $50,000, exclusive of interest and costs, and is between citizens of different States." S 1332(a)(1). Section 1332(a) was amended in 1996 to require that the amount in controversy exceed $75,000. See Pub. L. No. 104-317, S 205(a)(1), 110 Stat. 3850 (1996). This amendment took effect on January 14, 1997. See S 295(b). Accordingly, since Dardovitch filed suit on January 6, 1997, the required amount in controversy was $50,000, as Dardovitch alleged in his complaint. The precise amount-in-controversy requirement is not terribly important in this case, however, since it either exceeded $75,000 or was less than $50,000. The District Court purported to apply the new $75,000 requirement. See Dardovitch, 1998 WL 13271, at *1 n.1.

11

alleged, and Backos and Haltzman did not contest, that he is a citizen of Florida and that they were citizens of Pennsylvania. The only question before us is, whether the amount in controversy exceeds $50,000. At the time he filed the complaint, Dardovitch was only due about $34,000 from the Trust. His entire interest in the Trust, however, was $104,000. We must determine which of these two sums represents the amount in controversy.

The amount in controversy is determined from the good faith allegations in the complaint. See Spectacor Mgt. Group v. Brown, 131 F.3d 120, 122 (3d Cir. 1997), cert. denied, 118 S. Ct. 1799 (1998). "The sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288–89 (1938). Where a plaintiff brings a suit for payment of money as part of an ongoing and continually accruing obligation, such as an installment contract, the amount in controversy is generally limited to the amount then due and owing, even if a judgment would have collateral estoppel effects on liability for future payments. See Aetna Cas. & Sur. Co. v. Flowers, 330 U.S. 464, 467 (1947) ("If this case were one where judgment could be entered only for the installments due at the time of the commencement of the suit, future installments could not be considered in determining whether the jurisdictional amount was involved, even though the judgment would be determinative of liability for future installments as they accrued."). Where, by contrast, a suit is brought to establish directly the right to receive any payments because the putative defendant has repudiated that right entirely, and not just with respect to current payments, the amount in controversy is the entire amount that may ever come due. See Aetna , 330 U.S. at 469 (finding jurisdiction where a statute permitted a single action to establish the right to workers' compensation insurance installment payments, even though currently due payments did not exceed the jurisdictional amount; amount in controversy included future payments where the right to all the payments was in issue).

12

Haltzman submits that Dardovitch's complaint only put the currently due and owing payments in issue. 643<!>Specifically, Haltzman notes that, in his complaint, Dardovitch only requests payment of amounts presently due, not a determination of amounts that might come due in the future. See App. at 22. At the time he filed his complaint, Dardovitch had been informed that the amount then due would be at most slightly more than $30,000. See App. at 1805-14. Accordingly, Haltzman submits that Dardovitch could not allege in good faith that the amount in controversy exceeded $50,000.

We disagree. The District Court correctly concluded that the entire amount to which Dardovitch would ever be entitled under the Trust was in controversy, because one of the issues in this case -- one that was in fact heavily contested -- was whether Dardovitch was a beneficiary of the Trust. See Restatement (Second) of Trusts S 3(4) ("The person for whose benefit property is held in trust is the beneficiary."). An allegation or claim that a person is not a beneficiary of a trust is an allegation or claim that the person is not entitled to receive any of the proceeds of the trust. Accordingly, a suit to establish one's status as a beneficiary puts the entire amount of one's alleged interest in the trust in controversy.

Haltzman concedes that he denied that Dardovitch was a beneficiary. He attempts to justify this by saying this he intended only to deny that Dardovitch was entitled to demand an accounting or any other information concerning the Trust. The evidence in the record supports this contention. See App. at 56 (December 10, 1996 letter). This does not, however, imply that Dardovitch did not reasonably and in good faith believe that he needed to bring suit to establish his right as a beneficiary to receive his share of the proceeds of the Trust. To the contrary, an examination of the evidence, including that set forth in the margin,5 shows that it was eminently reasonable for

_____

5. Haltzman has consistently denied that Dardovitch was a beneficiary of the Trust. Haltzman begins the December 10, 1996, letter by asserting that "Nick Dardovitch is not a beneficiary of the Trust Agreement." App. at 56. In his answer to the complaint, Haltzman again denied that Dardovitch "is a named `beneficiary' of the trust as the named beneficiaries are Catherine Backos and Glen Eagle Square Equity Associates, Inc." App. at 99.

13

Dardovitch to think that he needed to do so. Furthermore, Haltzman litigated the issue of Dardovitch's status as a beneficiary extensively, and perhaps even excessively.6

Based on the foregoing facts, Dardovitch had good cause to believe that Haltzman had no intention of ever paying him any money out of the Trust; Haltzman's own statements apparently to that effect provide a strong basis for such a belief. Furthermore, it appears that Dardovitch in fact believed at the time he filed the complaint that he needed to bring suit to establish his right to receive any money from the Trust.7 In sum, Dardovitch alleged in good faith -- based on Haltzman's repeated statements to that effect -- that Haltzman had repudiated any obligation he had as a trustee to pay the proceeds of the Trust to Dardovitch as a beneficiary. Since it is not disputed here that Dardovitch's interest in the Trust was approximately $104,000, and this amount exceeds the jurisdictional

_____

6. See Dardovitch, 1998 WL 12371, at *7 ("Backos and Haltzman spent the better part of this long, acrimonious litigation resisting Dardovitch's demand to provide an account or even a copy of the Trust instrument, insisting from the beginning that he was not a beneficiary of the Trust.").
Even after the District Court granted Dardovitch's motion for partial summary judgment and ordered an accounting on the sole ground that Dardovitch was, in fact, a beneficiary of the Trust, Haltzman continued to deny it. See 1998 WL 12371, at *7; see also App. at 899, 955. Although Haltzman now concedes that Dardovitch is a beneficiary of the Trust, and does not challenge the District Court's conclusion to that effect on appeal, this late concession cannot change the result.

7. Dardovitch alleged in his complaint that Haltzman denied that Dardovitch was a beneficiary of the Trust, and further alleged that as a beneficiary he was entitled to receive distributions from the Trust. See App. at 21-22. In his response to Haltzman's motion to dismiss for lack of subject-matter jurisdiction, Dardovitch again referred to Haltzman's December 10, 1996, letter -- as well as Backos's answer to the complaint and Haltzman's affidavit in support of his motion to dismiss -- denying that Dardovitch was a beneficiary of the Trust. He specifically stated: "Whether plaintiff was entitled to distribution in excess of $50,000 on January 6, 1997, is immaterial, because Mr. Haltzman absolutely repudiated Mr. Dardovitch's entire claimed interests in the trust on December 10, 1996." App. at 64.

14

requirement under S 1332, the District Court properly concluded it had subject-matter jurisdiction.8

III. Haltzman Acceptance of Attorney's Fees for the Collection Actions

A. Background

Haltzman next argues that the District Court erred in concluding that he breached his fiduciary duty to the Trust. The District Court reasoned that by paying himself fees for collecting on the notes held by the Trust, Haltzman did so because his fees for the prior litigation included fees for the collection actions. Haltzman submits that he was legally entitled to such fees.

Dardovitch contends that the Trust and the retainer agreement provided that Haltzman's fees for undertaking the RICO litigation would also cover any steps he took to collect on the notes received in settlement of the litigation. He notes that the Trust provided for two categories of payments to Haltzman. First, it directed that expenses incurred by Haltzman in connection with the prosecution of the RICO litigation be paid out of the Trust. Second, it directed that the legal fees owed to Haltzman be paid "in strict accordance with the engagement agreement entered into" between Haltzman, Backos and GESEA. App. at 1766. Since the Trust incorporates the retainer agreement by reference, we must consider the language of the representation agreement itself.

Initially, in his proposal for representation, Haltzman agreed to the representation "on a contingency fee basis of 30% of any amount recovered . . . . [M]ajor out-of-pocket expenses for such things as deposition transcripts and filing fees will be payable currently on a 30 day basis." App.

_____

8. Dardovitch claimed, and the District Court appears to have agreed, that he met the jurisdictional amount requirement by an alternative method: in a claim for an accounting, the amount in controversy is the claimants' entire interest in the trust. Since we conclude that the amount-in-controversy requirement was otherwise met, we need not decide this question.

15

at 1775. Thereafter, GESEA adopted a shareholder agreement providing that "[t]he total of litigation fees and expenses (including reimbursements of shareholders) shall not exceed thirty percent (30%) of any recovery." App. at 1530-31. This agreement was subsequently amended to permit payment of expenses in addition to the fee of thirty percent of any recovery. App. at 1094. Still later, the representation agreement was amended, in a document signed by Haltzman and Backos, to provide that in addition to payment of expenses, "Mark S. Haltzman will receive, as a fee, the first $150,000 of any recovery received in the lawsuit," along with thirty percent of any recovery in excess of $300,000. App. at 1778. Dardovitch contends that this language covers not only the RICO litigation itself, but also any collateral steps taken to collect on the judgment.

Haltzman contends, however, that a different provision of the Trust governs the payment of attorney's fees for collecting on the notes:

> In the administration of the Trust, the Trustees shall have the following powers, all of which shall be exercised in a fiduciary capacity, primarily in the interest of the Glen Eagle Square Equity Associates, Inc. and Catherine Backos;
>
> . . . .
>
> . . . . [T]o enforce any Notes, bonds, mortgages, security agreements, or other obligations; . . . .
>
> To incur and pay the ordinary and necessary expenses of administration including (but not by way of limitation) reasonable attorneys' fees, accountants' fees, investment counsel fees, and the like.

App. at 1767-68. Haltzman submits that, pursuant to this provision, he had the power to undertake actions to enforce and collect on the notes, and further to pay himself attorney's fees for those actions if he chose to use his own professional services for such purposes. Also, as set forth in the margin, Backos testified that it was her intent that

16

Haltzman would be paid additional fees out of the Trust for his professional services in collecting on the notes.9

The District Court determined that Haltzman should not have accepted payments separate from those he received under the retainer agreement for work he undertook in collecting on the notes when the payors went into default, because the agreement, as incorporated into the Trust, already required him to do this work. The court based this conclusion on several grounds, including that ordinary rules of contract construction and interpretation dictated this reading of the retainer agreement, and that contingent fee agreements generally require the attorney to undertake efforts to collect the proceeds of the suit. We will discuss these factors in turn.10

_____

9. Backos testified as follows:

> Q: My first question to you is: What was your understanding in connection with the Fee Agreement you had with Mark S. Haltzman Associates, as to whether that firm was obligated to go out and collect the judgment that they were going to try to get for you in the
>
> litigation?
>
> A: My understanding was that the collection process, if we had to undertake that, was a separate matter, it was a separate litigation.

App. at 1255–56.

> Q: O.K. Now, with respect to the collection, it's your testimony that you have an understanding with Mr. Haltzman that his efforts in that direction are on top of what he has already received?
>
> A. Yes.

App. at 1295–96.

10. Some of the factors on which the District Court relied, however, do not support its conclusion that the fee agreement did not permit Haltzman to take additional fees for his work in the collection actions. First, the District Court concluded that Haltzman's interpretation should be rejected because it would amount to impermissible self-dealing by a trustee. The court noted that trust law prohibits a trustee from engaging in transactions between the trust property and himself individually, and concluded that Haltzman's paying himself for the collection actions out of the Trust's funds violated this prohibition. The prohibition on self-dealing, however, is limited to transactions in property. See Restatement (Second) of Trusts S 170 cmts. b–n; see also 2A Austin Wakeman Scott &

Before we may do so, however, we must determine the proper nature and scope of our review. This question turns on whether the District Court's interpretation of the agreement turned on findings of fact, or rather was a construction of the contract as a matter of law. We believe that the former is true. At the outset of its opinion and order, the court stated that it had held a hearing and was making "findings of fact and conclusions of law under Fed. R. Civ. P. 52(a)." See Dardovitch, 1998 WL 13271, at *1. Furthermore, in interpreting the agreement, the court weighed evidence and reached conclusions based on witness's credibility. See, e.g., Dardovitch, 1998 WL 13271, at *4 n.15. Finally, the court considered factors, such as Backos's testimony as to her own intent, that would only be relevant in the context of fact-finding as to the meaning of the contract, not in construing it as a matter of law.11

_____

William Franklin Fratcher, The Law of TrustsSS 170.2-.13, at 320-64 (4th ed. 1987). The per se prohibition against self-dealing does not apply to transactions in services. A trustee's choice to use his own special services -- beyond those usually rendered by a trustee -- where the trust requires them ordinarily does not violate the prohibition on self-dealing. See 3 Scott & Fratcher,supra, S 242.2, at 281-87; see also Restatement (Second) of Trusts S 242 cmt. d. The only limits on such transactions are the trustee's fiduciary duties of good faith and reasonable care. See id.; 3 Scott & Fratcher, supra, S 242.2, at 286. Accordingly, Haltzman's acceptance of additional fees did not violate the rule against self-dealing by a trustee.

The District Court also decided that, if the agreement were construed as Haltzman proposed, then his acceptance of the additional fees would have violated his duties under the Pennsylvania Rules of Professional Conduct. In particular, the court determined that Haltzman would have violated the rule requiring that contingent-fee agreements be in writing and that attorneys provide written statements concerning the outcome of such representation. See Pa. R. Prof. Conduct 1.5(c). Haltzman raises serious objections to both of the District Court's premises, i.e., whether his conduct would have violated the Rules of Professional Conduct and whether such a potential violation should guide the interpretation of a contract. Since we need not decide this difficult issue, we will not rely on this aspect of the District Court's reasoning in affirming its judgment. Even leaving this point aside, we think there is ample support in the record for the District Court's conclusion.

11. Admittedly, several other factors the court considered do fall within the ambit of legal construction of a contract, including the contra

Although it is a close question, we believe that the court's interpretation of the retainer agreement, as well as the Trust, rested on its findings of fact, and were not conclusions of law.

Furthermore, we think that fact-finding concerning the meaning of the agreement was appropriate and necessary, as the agreement was ambiguous on its face. Where a contract is ambiguous, the trier of fact must makefindings as to the parties' intent and the meaning of the contact. See In re Tutu Wells Contamination Litig., 120 F.3d 368, 389-90 (3d Cir. 1997). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1990). Here, the agreement made no mention of how the proceeds of any judgment or settlement would be collected; it mentioned at most the contingent-fee percentage and the payment method for litigation expenses. It would be reasonable to conclude either that the contingent fee included work done collecting on the settlement or judgment, or that it did not include such work. Accordingly, presently before us are the District Court's finding of facts interpreting the contract, which we review for clear error only.12

_____

preferentem principle (that a document should be interpreted against its drafter), whether the agreement violated the Rules of Professional Conduct, and the rule against self-dealing. But these factors can also be important in the factual interpretation of a contract. See, e.g., Restatement (Second) of Contracts S 203 cmt. a ("The rules of this section [concerning interpretation of contracts] . . . apply only in choosing among reasonable interpretations."); id. S 206 cmt. a ("[The rule of contra preferentem] is in strictness a rule of legal effect . . . as well as interpretation.").

12. See In re Tutu Wells Contamination Litig. , 120 F.3d 368, 389-90 (3d Cir. 1997). "In order to reject a district court's findings of fact, the reviewing court, after examining all the evidence, must be left with a definite and firm conviction that a mistake has been committed." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 147 (3d Cir. 1999).

19

B. Factors Considered by the District Court

1. Contract Interpretation

The District Court first concluded that, since Haltzman had drafted the representation agreement, ambiguities therein should be construed against him. Second, although it recognized the principle that contracts (as well as trusts) should be construed in accord with the intent of the parties (or the settlor), it rejected as self-serving Backos's testimony that she intended that Haltzman would be entitled to additional fees for collecting on the notes. We address the latter issue first, as it is the one upon which Haltzman primarily focuses.

a. Parties'/Settlor's Intent: It is beyond cavil that the touchstone of contract interpretation is the intent of the parties. See Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co., 610 F.2d 1174, 1181 (3d Cir. 1979). Likewise, the settlor's intent is the primary guide to interpreting a trust instrument. See Estate of Wolters, 59 A.2d 147, 149 (Pa. 1948); In re Benson, 615 A.2d 792, 794-95 (Pa. Super. Ct. 1992) ("The polestar in every trust is the settlor's intent and that intent must prevail." (citation omitted)). Haltzman therefore argues that, since Backos -- a party to the retainer agreement and the settlor of the Trust-- testified to her intent to permit Haltzman additional fees, the District Court had no choice but to accept her testimony and interpret the Trust and representation agreement in accord therewith. We disagree.

A party's testimony as to her intent concerning the meaning and effect of a contract can, of course, be significant evidence of the meaning of the contract. It is not, however, conclusive evidence to that effect. Often, a writing itself is the best evidence of the parties' or settlor's intent. Delaware County v. Delaware County Prison Employees Indep. Union, 713 A.2d 1135, 1137 (Pa. 1998) ("The intent of the parties to a written contract is deemed to be embodied in the writing itself . . . ."); Volunteer Firemen's Ins. Services, Inc. v. CIGNA Prop. & Cas. Ins. Agency, 693 A.2d 1330, 1339 (Pa. Super. Ct. 1997) ("To determine the intent of contracting parties, we look to language contained

20

in the written contract."); Benson, 615 A.2d at 795 ("[T]he writing itself must be considered to be the best and controlling evidence of the settlor's intent." (quoting In re Girard Trust Corn Exch. Bank, 208 A.2d 857, 859 (Pa. 1965))). Both the testimony of the parties or settlor and the writing itself are evidence of the meaning of the contract; the weight due each depends on the usual factors, including credibility.

The District Court considered Backos's testimony concerning her intent in entering into the fee agreement and settling the Trust, but rejected it on credibility grounds. Backos testified before the District Court concerning her intent in entering into the representation agreement and settling the Trust. As noted previously, she testified that she intended that Haltzman would be paid additional fees out of the Trust for collecting on the notes. The District Court found that Backos's testimony was simply not credible:

> Although defendant Backos testified at length regarding her understanding of the agreements made between GESEA and Haltzman, we do not accord that aspect of her testimony much weight. We do not question Ms. Backos's level of sophistication in business affairs -- quite to the contrary, her testimony showed her to be an intelligent and very capable businesswoman -- but it is evident from these proceedings that in legal matters she relied exclusively on Haltzman and his firm. Indeed, Haltzman's firm represented her even in this litigation. Thus, it is perhaps not surprising that Ms. Backos's testimony proceeded in virtual lockstep to support defendant Haltzman's various arguments before us.

> Furthermore, to the extent that Ms. Backos's testimony is derived from her own understanding-- rather than Haltzman's influence on that understanding of legal matters -- we also reject it as self-serving. At the time that Ms. Backos entered into representation agreements with Haltzman, she was most influenced by financial pressures which eventually forced her to file bankruptcy. Accordingly, we find that her construction of these agreements

21

> arose almost wholly out of her own individual financial
> interests, and improperly ignored the interests of
> GESEA, which she as majority shareholder is required
> to consider.

Dardovitch, 1998 WL 13271, at *4 n.15.

The credibility of witnesses is quintessentially the
province of the trial court, not the appellate court.
"Credibility determinations are the unique province of a fact
finder, be it a jury, or a judge sitting without a jury." United
States v. Kole, 164 F.3d 164, 177 (3d Cir. 1998), cert.
denied, 119 S. Ct. 1484 (1999); see also Anderson v. City of
Bessemer City, 470 U.S. 564, 575 (1985); Newark Branch,
NAACP v. City of Bayonne, 134 F.3d 113, 120 (3d Cir.
1998) ("[Clearly erroneous] review is more deferential with
respect to determinations about the credibility of witnesses
. . . ." (citation omitted)). Accordingly, we may only reject a
District Court's finding concerning a witness's credibility in
rare circumstances. Such circumstances are not present
here, as the record, as well as common sense, amply
supports the District Court's conclusion as to the weight to
be accorded to Backos's testimony.

The District Court observed that Backos's testimony was
undoubtedly influenced by her close relationship with
Haltzman, who had represented her throughout the
underlying RICO litigation and through much of the present
case. Accordingly, the court's conclusion that Backos's
testimony can be discounted because of Haltzman's
influence over it is reasonable. More importantly, we think
that the District Court had good reason to believe that
Backos's testimony was influenced by her own biases. The
court noted that Backos was subject to financial pressures
that influenced her actions and her testimony. Additionally,
Backos's testimony was not only helpful to Haltzman, but,
at least from an ex ante perspective, was directly beneficial
to Backos herself. Backos was no doubt aware at the time
she testified that she herself could be held liable for her co-
trustee's breach in taking fees from the Trust to pay for the
collection actions. Thus, at least until the District Court
excused her from liability for Haltzman's breach, Backos
had her own reason for testifying that Haltzman's actions
were in accord with her intent in entering into the retainer

22

agreement and settling the Trust. In sum, we perceive no clear error in the District Court's decision not to credit Backos's testimony.

b. Contra Preferentem: In addition to disc ounting Backos's testimony as to her intent, the District Court also found it significant, for the purpose of interpreting the Trust and retainer agreement, that both documents were drafted by Haltzman. It cannot be doubted that "[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." Restatement (Second) of Contracts S 206. The District Court concluded that this traditional canon of contractual interpretation supported Dardovitch's reading of the retainer agreement and Trust:

> Among other things which Haltzman omitted from his contingent fee agreement with GESEA is an explicit statement of the scope of the representation that the fee agreement embraces. As a matter of contract law, Haltzman's status as drafter of the document requires that all ambiguities be construed against him. All-Pak, Inc. v. Johnson, 694 A.2d 347, 351 n.7 (Pa. Super. Ct. 1997) (citing Gallagher v. Fidelcor, Inc., 657 A.2d 31 (Pa. Super. Ct. 1995)).

Dardovitch, 1998 WL 13271, at * 4. The court was correct that -- if it applied -- this canon suggests that Haltzman's interpretation of the contract should not be adopted.

Haltzman urges that we not apply this canon in favor of Dardovitch because Dardovitch was not a party to the fee agreement. In particular, he notes that the retainer agreement at most was between Haltzman and Backos and GESEA, and that GESEA and Backos were the settlors of the Trust. Although this is technically true, we think that Dardovitch's involvement with the contracts-- as a shareholder of GESEA and a beneficiary of the trust -- was sufficient that the District Court did not err in relying on the fact that Haltzman drafted the agreement and the Trust in determining the appropriate interpretation thereof. Furthermore, the rule of contra preferentem is based

23

primarily on the idea that the party drafting an agreement should bear responsibility for any ambiguities in it, as "he is likely to provide more carefully for the protection of his own interests than for those of the other party." See Restatement (Second) of Contracts S 206 cmt. a. Given this focus, it was permissible to focus on Haltzman's position as drafter in declining to interpret the agreement in his favor. Accordingly, we think that the District Court did not err in considering the fact that Haltzman drafted the retainer agreement in interpreting it.

2. The Meaning of Contingent Fee Agreements

The other basis on which the District Court rested its interpretation of the retainer agreement was its understanding of contingent fee agreements of the sort entered into here. Relying on common-sense and straightforward reasoning about lawyers' incentives, as well as the language of the retainer agreement, the court concluded that the most reasonable reading of the agreement was one that permitted no additional payment to Haltzman for the collection actions.

> [A]s a matter of common sense the contingent fee cannot be read to exclude collection of the settlement proceeds. We suspect that few lawyers would rest with the hope of 30% of a paper settlement, but not promptly seek collection of the real money that will turn that paper into cash. Indeed, the documents upon which Haltzman seeks to rely notably confirm our suspicion, stating that Haltzman is to receive his fees only on moneys actually "recovered" or "received."

Dardovitch, 1998 WL 13271, at *5. Based on our review of the general law governing the responsibilities of contingent fee representation, we agree with the District Court.

While the extant case law in this area supports the proposition that a contingent-fee attorney is not entitled to additional fees for collecting on a judgment, absent substantial indications to the contrary, it is sparse.13 This

_____

13. The case law on a related issue -- the responsibility of a contingent-fee attorney with respect to services to be rendered on appeal -- is much

issue is most extensively discussed in L.A. Bradshaw, Annotation, Construction of Contingent Fee Contract as Regards Compensation for Services After Judgment or on Appeal, 13 A.L.R.3d 673 (1968). This annotation discusses a number of cases in which attorneys have attempted to recover additional fees beyond an established contingent fee for collection efforts. These cases establish that, absent some significant evidence that the collection efforts were not within the contemplation of the parties at the time they entered into the contingent fee agreement, no additional fees will be permitted.

Those cases in which additional fees have been permitted have involved collection efforts far beyond those which the parties anticipated at the time the representation began. In Barcus v. Gates, 130 F. 364 (E.D. Va.), affd., 136 F. 184 (4th Cir. 1904), for example, parol evidence established that, when the parties entered into a ten-percent contingent fee agreement, they expected the case to settle quickly without even filing a suit. When instead a highly contested suit was required, and the attorney was required to spend an additional month after trial determining what, if anything, could be recovered from the various defendants, the court concluded that the attorney should be entitled to additional fees for these collection efforts. See Barcus, 130 F. at 369-70; see also Serat v. Smith, 15 N.Y.S. 330 (Sup. Ct. 1891) (additional fee permitted where parties did not contemplate that collection would be difficult). Similarly, in Judah v. Trustees of Vincennes Univ., 16 Ind. 56 (1861), discussed in 13 A.L.R.3d at _____, the court permitted

_____

more developed. See, e.g., Quarture v. Allegheny County, 14 A.2d 575 (Pa. Super. Ct. 1940) (attorney working for contingent fee was not entitled to additional fee for prosecuting appeal, even where attorney believed that appeal was unlikely to result in an increased damages award). Other courts have cited this case law without analysis in support of the proposition that contingent fee attorneys may not recover additional fees for collection actions. See, e.g., Goldstein & Price v. Tonkin
& Mondl, 974 S.W.2d 543, 548 (Mo. Ct. App. 1998); Mrozinski v. Marinello, 260 N.Y.S.2d 199 (Sup. Ct. 1965). Although it provides some support for the result we reach, we do not find the analogy to Quarture terribly convincing, as prosecuting an appeal involves the same course of representation as the underlying litigation in a more obvious sense than an action to collect on the proceeds of a settlement or judgment.

additional fees for collection where the attorney's efforts involved lobbying the state legislature to release funds to pay the judgment. In contrast, where the record reveals that the parties had no reason to believe that collection would require more than minimal effort, attorneys have been permitted no additional fee for collection actions. See, e.g., Mrozinski v. Marinello, 260 N.Y.S.2d 199 (Sup. Ct. 1965); Ellis v. Mitchell, 85 N.Y.S.2d 398 (Sup. Ct. 1948), affd., 88 N.Y.S.2d 903 (Sup. Ct. App. Div. 1949); Emil Nathan & Co. v Halsell, 45 So. 856 (Miss. 1908).

This understanding of the responsibility of attorneys in contingent fee cases is, as the District Court pointed out, consonant with the incentives confronting such an attorney. "We suspect that few lawyers would rest with the hope of 30% of a paper settlement, but not promptly seek collection of real money that will turn that paper into cash." Dardovitch, 1998 WL 13271, at *5. The attorney has just as much of an interest in collecting on the judgment as the client, and thus should need no extra incentive in the form of additional fees for doing so. We believe that this reading comports with the general understanding of the community of attorneys.

This conclusion is also supported by the reasoning of the court in Goldstein & Price v. Tonkin & Mondl, 974 S.W.2d 543 (Mo. Ct. App. 1998). In that case, the court concluded that, since the fee agreement permitted a fee of "1/3 of all monies recovered by judgment or settlement," Goldstein & Price, 974 S.W.2d at 546 -- as opposed to "1/3 of any recovery of judgment or settlement" -- the attorney was only entitled to a contingent fee from money actually received. See 974 S.W.2d at 548. The language of the fee agreement in the present case is similar: the original agreement permitted Haltzman a fee of "30% of any amount recovered," and later versions permitted a fee out of "any recovery received" or "any amount received." We believe that if an attorney wishes to protect himself, and provide for attorney's fees in the event additional collection efforts are necessary, he should do so explicitly in the retainer agreement. We agree with the District Court that this is the common-sense understanding of contingent-fee agreements.

26

The two pieces of record evidence that Haltzman cites to support his contention that collection efforts were not contemplated as part of the retainer agreement do not alter our conclusion. First, he contends that, at the time of settlement, he did not think that collection efforts would be difficult, as reflected by the fact that he was willing to accept notes from the defendants. But he testified that he accepted notes because the defendants did not have a lot of money; given this concern, one might expect that they would have difficulty paying off the notes as well, and that collection efforts might be necessary. Second, Haltzman points out that Backos wrote to Dardovitch after the settlement indicating that collection efforts might be necessary and that Haltzman would be paid additional fees for them. Both of these submissions share an additional fundamental flaw: they say nothing about what the parties contemplated at the time they entered into the retainer agreement. There is simply no evidence in the record that the parties had any reason to think, or actually did think, that collection efforts following judgment in the RICO litigation would be minimal. Accordingly, we conclude the District Court was correct to conclude that the retainer agreement in this case, as with most contingent fee agreements, permitted no additional fee for collateral collection activities.

C. Summary

The District Court identified several reasons why the retainer agreement should be interpreted to cover Haltzman's efforts to collect on the notes, thereby preventing him from collecting additional fees for these efforts from the Trust. In particular, the District Court was correct to note that ordinary rules of contract interpretation, as well as a common-sense understanding of the typical duties of an attorney working for a contingent fee, support this reading. Although Haltzman has raised some questions about some other aspects of the court's reasoning, see supra note 10, we are not,"after examining all the evidence, . . . left with a definite and firm conviction that a mistake has been committed" in interpreting the retainer agreement, Durham Life, 166 F.3d at 147, and thus

27

do not believe that the District Court's conclusion was clearly erroneous. Accordingly, we will affirm the District Court's order to the extent that it found that Haltzman breached his fiduciary duty by accepting the additional fees from the Trust.

IV. Haltzman's Liability for Attorney's Fees

A. District Court Decision

Haltzman also appeals from the District Court's decision to require him to pay Dardovitch's attorney's fees in this litigation. The court ordered Haltzman to pay $59,000 in attorney's fees to Dardovitch, as well as $4,735.52 in costs.

The District Court based its decision to award attorney's fees primarily on Haltzman's actions in refusing to provide Dardovitch with an accounting of the Trust's funds. See Dardovitch, 1998 WL 13271, at *7. It noted that "Backos and Haltzman spent the better part of this long, acrimonious litigation resisting Dardovitch's demand to provide an account or even a copy of the Trust instrument, insisting from the beginning that he was not a beneficiary of the Trust." 1998 WL 13271, at *7. It also observed that the defendants continued to deny that Dardovitch was a beneficiary of the Trust entitled to an accounting even after the court granted Dardovitch summary judgment on the ground that it was incontrovertible that he was a beneficiary. See 1998 WL 13271, at *7. Concluding that "the trustees' failure to recognize basic principles of trust law [wa]s a breach of fiduciary duty that can only have resulted from bad faith or, at a minimum, gross negligence," the court found Haltzman liable for Dardovitch's attorney's fees. 1998 WL 13271, at *7. The court also noted, however, that Haltzman should be liable for Dardovitch's fees because he blatantly breached his fiduciary duty in accepting additional fees from the Trust for the collection actions.

In calculating the fees owed, the District Court divided the litigation into two phases, before and after the accounting. The pre-Accounting litigation revolved primarily around determining whether Dardovitch was in fact a

28

beneficiary entitled to demand an accounting, although it included some other matters, such as discovery disputes and litigation of subject-matter jurisdiction and Haltzman's right to demand a jury trial. After the District Court granted Dardovitch's motion for partial summary judgment and Backos and Haltzman provided an accounting, the parties litigated and held a hearing concerning a number of substantive issues. This post-Accounting litigation focused on resolving Dardovitch's objections to the accounting itself, along with his more general claims against Haltzman and Backos, but it also included collateral matters, such as the determination of the attorney's fee award.

The court took Dardovitch's request for approximately $60,000 in pre-Accounting fees, and reduced it to $50,000 "to (1) account for activity unrelated to the trustees' malfeasances and (2) reflect more accurately the value conferred to the Trust as a result of the account." Appellant's Brf. App. 1, at 7. With respect to the post-Accounting fees, the District Court substantially reduced these from the amount Dardovitch requested. In so doing, it noted that he had not prevailed on his non-trust claims, as well as on a majority of his objections and exceptions to the accounting. On the other hand, it recognized that he did prevail in significant part in his objections to the accounting, which resulted in the return of substantial funds to the Trust corpus. Accordingly, it awarded him about 25% of the amount he had requested, or $9,000. In addition, the court awarded Dardovitch his costs in full.

B. Is Haltzman Liable for Dardovitch's Attorney's Fees?

Haltzman contends that the District Court had no power to direct him to pay Dardovitch's attorney's fees at all. Dardovitch responds that the court has the power under trust law to award attorney's fees. In particular, a court deciding a trust case can grant a beneficiary attorney's fees from the trustee where the beneficiary's legal action results in the creation or preservation of the trust in general, and where the trustee breaches his fiduciary duty with more than ordinary fault. We begin by explicating these general principles in greater detail; we then apply them to analyze

29

the District Court's attorney's fee awards for the two phases
of the litigation.

1. General Principles Governing Award of Attorney's Fees
Awards in Trust Actions

Although Dardovitch suggested a number of bases for the
award of attorney's fees, the District Court relied on general
common-law equity principles in granting the request.
Pennsylvania follows the so-called American Rule regarding
the award of attorney's fees: "[T]here can be no recovery for
counsel fees from the adverse party to a cause, in the
absence of express statutory allowance of the same, or clear
agreement by the parties, or some other established
exception." First State Underwriters Agency of New England
Reins. Co. v. Travelers Ins. Co., 803 F.2d 1308, 1318 (3d
Cir. 1986).14 One of the more common exceptions to the
American Rule is that attorney's fees are available at the
discretion of the court in cases involving trusts. See Estate
of Tose, 393 A.2d 629 (Pa. 1978).

A prominent treatise best summarizes the principles
behind this exception:

> In suits to enforce the rights of trust beneficiaries the
> court exercises its discretion as to the allowance of
> attorney fees and costs, either from the trust estate or
> from other sources. . . .
>
> In exercising its discretion in these matters the court
> will consider whether the plaintiff or other party was
> successful in obtaining the relief requested or in
> defending or conserving the trust estate, for example,
> by protecting the trust against an unjust claim. The
> court may also consider whether the successful party
> benefitted or enhanced the trust estate in deciding
> whether his attorneys' fees should be awarded from the
> trust estate. These considerations are sometimes
> expressed as the common fund doctrine or the

_____

14. Because this is a diversity case, the relevant state law concerning
attorney's fees applies. See Security Mut. Life Ins. Co. v. Contemporary
Real Estate Assocs., 979 F.2d 329, 331-32 (3d Cir. 1992).

30

substantial benefit rule, either of which allows the successful party reasonable attorneys' fees.

In exercising its discretion the court may consider other factors such as the nature and extent of the defendant's wrongful conduct, and whether there was good faith on the part of the defendant.

A further question relates to the source from which the costs and fees should be paid. In some cases the courts have held that the fees of the successful plaintiff should be paid from the principal of the trust estate because the trust had been protected or enhanced. In other cases the trustee or other party defendant has been held personally liable for the plaintiff 's costs and fees.

16 George Gleason Bogert et al., The Law of Trusts and Trustees S 871, at 184-97 (rev. 2d ed. 1998) (footnotes omitted); see also Annotation, Allowance of Attorneys' Fees in, or Other Costs of, Litigation by Beneficiary Respecting Trust, 9 A.L.R.2d 1132 (1950). Pennsylvania courts have adopted these principles. See Estate of Trimble , 140 A.2d 609 (Pa. 1958) (beneficiary may be entitled to a fee award where action results in preservation of funds of trust); Estate of Kline, 124 A. 280 (Pa. 1924) (trustee may be required to pay fees incurred as a result of his actions); Estate of Wescott, 72 Pa. D. & C. 519 (Orph. Ct. 1951) (beneficiary may be entitled to a fee award in an action brought to establish the validity of a trust).

Most importantly for our review, the District Court's discretion in deciding whether to grant attorney's fees in an equity case is exceedingly broad. "The allowance of counsel fees, where recoverable, rests largely in the discretion of the trial court which heard the principal action." Williams v. Williams, 540 A.2d 563, 572 (Pa. Super. Ct. 1988) (citing Estate of Ward, 38 A.2d 50, 52 (Pa. 1944))." `The allowance or disallowance of counsel fees rests generally in the judgment of the court of the first instance and its decision will not be interfered with except for palpable error.' " Trimble, 140 A.2d at 615 (quoting Ward)."The determination of the award of attorneys' fees is within the sound discretion of the trial judge, and will not be

31

overturned absent an abuse of discretion." Security Mut. Life Ins. Co. v. Contemporary Real Estate Assocs. , 979 F.2d 329, 331-32 (3d Cir. 1992). Accordingly, we must determine whether the District Court abused its discretion in determining that Haltzman should be liable for some of Dardovitch's attorney's fees. "An abuse of discretion may be found when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Reform Party v. Allegheny County Dept. of Elections, 174 F.3d 305, 311 (3d Cir. 1999) (en banc).

2. Fees for Pre-Accounting Litigation

The District Court awarded Dardovitch most of the requested fees for litigation during the period prior to the court's decision requiring the trustees to account. It based this decision on Haltzman's continued refusal -- both when Dardovitch requested such information and after this litigation was instituted -- to recognize Dardovitch's status as a beneficiary entitled to information about the Trust, particularly given that he was specifically named in the Trust as someone entitled to receive funds. The court concluded that the only possible explanation for this conduct was bad faith, and accordingly ordered Haltzman to pay most of Dardovitch's attorney's fees expended in establishing his right to demand an accounting. We perceive no abuse of discretion in the District Court's decision.

As noted above, a trustee may be found liable for a beneficiary's attorney's fees when the trustee has acted wrongfully, especially where the litigation itself is made necessary by the trustee's defalcation. See Kline. For example, in In re Catell's Estate, 38 A.2d 466 (Del. Ch. Ct. 1944), the trustee failed to give a bond as required by the settlor. The beneficiaries of the trust brought an action to have the trustee removed, but the court refused to remove the trustee because he gave the bond after the suit was filed and the trust suffered no loss. In spite of the fact that the beneficiaries did not receive the relief they sought, the court ordered the trustee to pay their attorney's fees as the suit was made necessary only because of the trustee's

32

failure to observe the clear terms of the trust. See also Tucker v. Brown, 150 P.2d 604 (Wisc. 1944) (where a trustee repudiated the trust and refused to account, a beneficiary who successfully sues him to enforce the trust is entitled to costs from the personal funds of the trustee).

We think it clear that the lengthy pre-Accounting litigation was necessitated by Haltzman's persistent refusal to provide Dardovitch with an accounting. This refusal began in letters sent to Dardovitch denying him any information about the Trust and threatening him with litigation. It continued through the lengthy proceedings before the District Court granted Dardovitch's motion for partial summary judgment. The District Court also noted that, even after it determined as a matter of law that Dardovitch was a beneficiary entitled to an accounting, Haltzman continued to deny that Dardovitch was a beneficiary of the Trust. See Dardovitch, 1998 WL 13271, at *7 ("Moreover, to this day the trustees continue to deny that plaintiff is entitled to an accounting . . . despite our Order . . . in which we stated that `[i]t would be hard to imagine a clearer example' of a trust beneficiary than one in plaintiff 's position.").

Furthermore, the litigation provided a benefit to the Trust, as it brought about an accounting of the Trust that exposed breaches of fiduciary duty. Under the trustees' apparent understanding of the term "beneficiary," no one was entitled to seek an accounting. Thus, by bringing the litigation, Dardovitch forced the trustees to give an account for their actions, which they otherwise would not have done. This was undoubtedly of benefit to the Trust. In addition, aside from the intrinsic benefit of having an accounting performed, the accounting here exposed the breach of fiduciary duty discussed above. As a result of this exposure, a substantial amount of funds will be preserved for the beneficiaries. Accordingly, we do not believe that the District Court abused its discretion in awarding Dardovitch attorney's fees for the pre-Accounting litigation to be paid by Haltzman.

3. Fees for Post-Accounting Litigation

The District Court also awarded Dardovitch a portion of the attorney's fees he requested for work done after the

33

court called the trustees to account. It based this award on the fact that Dardovitch's litigation of his objections to the accounting resulted in a benefit to the Trust to the extent that it resulted in the return of funds to the Trust, as well as a reduction in the potential liabilities of the Trust, i.e., it would not in the future need to pay Haltzman for collecting on the notes. In addition, it required Haltzman to pay these fees because it found he breached hisfiduciary duty in a way that resulted in a direct benefit to himself, i.e., the additional fees themselves.

The District Court did not abuse its discretion here either. One of the situations in which a court may award attorney's fees is where the litigation results in a benefit to the trust as whole. See Trimble. Here, as a result of Dardovitch's objections to the account, Haltzman was ordered to return certain fees to the Trust, and will not be permitted in the future to withdraw additional fees. Furthermore, the District Court appropriately ordered the trustee himself, as opposed to the Trust, to pay the fees. By accepting the additional fees for the collection actions, Haltzman, an attorney, not only breached his fiduciary duty, but did so in a way that resulted in a direct benefit to himself. This case is thus unlike those in which a trustee breaches his duty by making an improper investment, which causes a loss to the trust estate but no corresponding gain to the trustee. Although, as discussed above, Haltzman did not engage in per se impermissible self-dealing, his breach of trust resulting in a direct profit to him justifies the District Court's award of attorney's fees in favor Dardovitch to be paid by Haltzman. Accordingly, we will affirm the District Court's decision that Haltzman should be liable for Dardovitch's attorney's fees, at least in part.

C. Calculation of the Fee Award Amount

Although we will affirm the District Court's decision to award attorney's fees, we will vacate the order and remand the matter because the District Court did not properly determine the amount of attorney's fees to be awarded. Dardovitch requested $60,712.78 in pre-Accounting fees, and $35,649 in post-Accounting fees. Without holding a

34

hearing, the District Court found that the hourly rates were reasonable, but reduced the awards to $50,000 and $9,000 respectively. It calculated these amounts as follows: the $50,000 pre-Accounting award was reduced from the $60,000 Dardovitch requested based on the fact that Dardovitch's attorneys had performed some work before the accounting unrelated to establishing Dardovitch's status as a beneficiary, and so as to reflect more accurately the value conferred on the Trust by the accounting. It based the $9,000 post-Accounting award on a roughly 75% reduction of the requested fee, which it derived from Dardovitch's lack of success on his pre-Trust claims and several of his objections to the accounting, along with his substantial success on a major objection to the accounting.

We think that our recent decision in Security Mutual Life Insurance Co. of New York v. Contemporary Real Estate Associates, 979 F.2d 329 (3d Cir. 1992), controls. There, in an action for collection on a mortgage note that included a provision for attorney's fees, the district court ordered the debtor to pay the lender's attorney's fees without holding a hearing, making a finding as to the reasonableness of the fees, and without explaining the rationale for the award. We vacated the award:

> Defendant requested discovery regarding attorney's fees. The district court implicitly denied this request by approving the second proposed form of judgment submitted by Security Mutual. . . . [I]t conducted no hearing and made no findings of fact as to the reasonableness of the fees requested and gave no statement as to the standard governing its award. Thus, we cannot adequately review the reasonableness of the action of the district court in awarding counsel fees under the circumstances. We conclude that its action was not consistent with a sound exercise of discretion under Pennsylvania law.

Security Mut., 979 F.2d at 332; see also Estate of Brockerman, 480 A.2d 1199, 1204 (Pa. Super. Ct. 1984) (remanding fee award where record did not indicate "what hourly rate the firm charged, what the prevailing rate in the general area was at the time, what services were performed, or how much time those services consumed"); cf. Estate of

Baker, 401 A.2d 737 (Pa. 1979) (no remand necessary where trial court heard lengthy testimony and made extensive findings regarding the services rendered by the attorney, the difficulty of the actions undertaken, and the reasonableness of the fee request as a whole); Sewak v. Lockhart, 699 A.2d 755 (Pa. Super. Ct. 1997).

The District Court's fee award in this case is like that in Security Mutual. In determining the fee award, the District Court relied only upon Dardovitch's submission, which included statements from the attorneys and their time records. The court held no hearing on this issue, and Haltzman had no opportunity to challenge on a factual basis the fee requested. Haltzman in fact identifies several contested factual issues concerning the attorney's fee award, including whether the fees were incurred in response to abusive conduct, whether Dardovitch presented adequate documentation for the fees, and whether Dardovitch is entitled to fees for preparation of the fee petition.[15]

Furthermore, the reasoning supporting the District Court's decision to reduce the fee awarded below that requested is sketchy. For instance, the court reduced the fee award for pre-Accounting litigation by $10,000 "to account for activity unrelated to the trustees' malfeasances and [to] reflect more accurately the value conferred to the Trust as a result of the account." We cannot determine from the record whether this reduction was supported. Likewise, the District Court awarded Dardovitch only 25% of his request for post-Accounting fees, because many of his objections to the account failed. But we cannot determine from the record whether the 25% figure accurately represents the amount of work expended on the successful claim. The District Court was fully familiar with the record and perhaps instinctively reached the correct result; because it did not hold a hearing and set forth an adequate explanation of its calculations, however, we cannot be sure that its award of attorney's fees was

_____

15. In identifying these issues, we express no opinion whether and the extent to which they are significant in the determination of attorney's fees.

consistent with the exercise of sound discretion. Accordingly, we will vacate the attorney's fee award and remand this matter to the District Court for further proceedings.

V. Backos's Liability

Dardovitch cross-appeals from the District Court's order excusing Backos from liability for the repayment of the attorney's fees improperly paid to Haltzman for the collection actions. He contends that Backos was negligent in failing to prevent Haltzman from breaching the Trust, and therefore should be jointly liable with Haltzman. Dardovitch further submits that Backos should not be excused from liability because she relied on the advice of her attorney, i.e., Haltzman.

The District Court's holding concerning Backos's liability is somewhat murky. Its discussion of the issue occurs mainly in the context of liability for Dardovitch's attorney's fees. During its explanation of why Backos would not be jointly liable with Haltzman for Dardovitch's attorney's fees, the court inserted a footnote stating that it would not hold Backos liable for the underlying breach of fiduciary duty. "While there is ample evidence of Ms. Backos's neglect as trustee which might be construed to support [a claim against her for imputed breach of fiduciary duty], for the reasons stated supra . . . we think that her co-trustee's malfeasance should not be imputed to Ms. Backos." Dardovitch, 1998 WL 13271, at *8 n.28. In the referenced portion of the opinion, the court stated as follows:

> We do not question Ms. Backos's level of sophistication in business affairs -- quite to the contrary, her testimony showed her to be an intelligent and very capable businesswoman -- but it is evident from these proceedings that in legal matters she relied exclusively on Haltzman and his firm. Indeed, Haltzman's firm represented her even in this litigation.

1998 WL 13271, at *4 n.15. Because of Backos's reliance

37

on counsel, and Haltzman in particular, the District Court excused her from liability.16

A trustee must exercise reasonable care to ensure that his or her co-trustees do not breach their fiduciary duties. In general, of course, "[a] trustee is not liable to the beneficiary for a breach of trust committed by a co-trustee." Herr v. United States Cas. Co., 31 A.2d 533, 534 (Pa. 1943) (quoting Restatement (First) of Trusts S 224(1)); see also Restatement (Second) of Trusts S 224(1); 3 Scott & Fratcher, supra, S 224, at 401. This is not an absolute rule, however:

> A trustee is liable to the beneficiary, if he (a) participates in a breach of trust committed by his co-trustee; or (b) improperly delegates the administration of the trust to his co-trustee; or (c) approves or acquiesces in or conceals a breach of trust committed by his co-trustee; or (d) by his failure to exercise reasonable care in the administration of the trust has enabled his co-trustee to commit a breach of trust; or (e) neglects to take proper steps to compel his co-trustee to redress a breach of trust.

Restatement (Second) of Trusts S 224(2); accord 3 Scott & Fratcher, supra, S 224, at 401 (same); see also Herr, 31 A.2d at 534 (quoting in part Restatement (First) of Trusts S 224(2)).

These exceptions flow out of the general duty of each co-trustee with respect to the action of his or her fellows. "If there are several trustees, each trustee is under a duty to the beneficiary to participate in the administration of the trust and to use reasonable care to prevent a co-trustee from committing a breach of trust or to compel a co-trustee to redress a breach of trust." Restatement (Second) of Trusts S 184. "A fiduciary is required to use such common skill, prudence and caution as a prudent man, under similar circumstances, would exercise in connection with

_____

16. We apply plenary review to this question, since it concerns whether the District Court applied the proper legal standard-- subjective reasonableness in relying on advice of counsel versus objective reasonableness. See In re Assets of Martin, 1 F.3d 1351, 1357 (3d Cir. 1993).

the management of his own estate." Estate of Lohm, 269 A.2d 451, 454 (Pa. 1970); see also Estate of Lerch, 159 A.2d 506, 509 (Pa. 1960). This duty of care is not reduced even if the specific trustee lacks skill in some respects. See Restatement (Second) of Trusts S 174 cmt. a ("A trustee is liable for a loss resulting from his failure to use the care and skill of a man of ordinary prudence, although he may have exercised all the care and skill of which he was capable.").

Pennsylvania case law demonstrates the extent to which simple, passive negligence can give rise to liability for the breaches of a co-trustee. In Estate of Adams, 70 A. 436 (Pa. 1908), the court held a trustee liable for his negligent failure to prevent a breach by a co-trustee, even where he had previously taken some steps to present such a breach. The trust corpus in Adams included some bonds that were held in a safe deposit box that the trustees had agreed they would not open unless both were present. One trustee, who was aware that the other was in financial distress, discovered that the bonds were missing in 1896. He then confronted the other trustee, who returned the bonds and agreed not to open the box in the first's absence. The first trustee did not inform the bank of this arrangement. He became an invalid in 1904, shortly after the trustees' last joint visit to the safety deposit box. The second trustee died in 1906, at which time it was discovered that the bonds were missing. The court in Adams affirmed the Orphan's Court's conclusion that the first trustee had acted negligently and should be held liable for the missing bonds.

In Estate of Reyburn, 43 Pa. D. & C. 85 (Orph. Ct. 1942), the court held a trustee liable for the breach of his co-trustee where he relied on his co-trustee's expertise to the trust's detriment. The co-trustee in Reyburn, a trust company, invested certain trust funds in assets in which the settlor had indicated trust funds could not be invested. The individual trustee knew nothing about the terms of the will limiting the possible investments, nor was he aware of those facts that indicated that the assets were not proper investments. He simply assumed that they were appropriate because he presumed that the trust company would not have purchased them if they were not appropriate. The

39

court found that the individual trustee was liable for the trust company's breach because he was negligent in failing to oversee the company's actions. Furthermore, since the trust company had not actively misstated material facts relating to the investment, he was not excused from liability for relying on its expertise. In particular, the court stated that "there is no presumption of greater competence in a trust company than in an individual." 43 Pa. D. &. C. at 90.

Furthermore, advice of counsel is not an absolute defense to liability for a breach of fiduciary duty, including liability for the defalcation of a co-trustee. "Although the court will consider that the executor acted upon the advice of counsel in determining whether he acted in good faith, this does not provide the executor with complete immunity to a surcharge." Estate of Geniviva, 675 A.2d 306, 310 (Pa. Super. Ct. 1996) (citing Lohm, 269 A.2d at 455); see also Lohm, 269 A.2d at 455 ("Where a fiduciary acts upon the advice of counsel, such fact is a factor to be considered in determining good faith, but is not a blanket of immunity in all circumstances." (citations and quotations omitted)). "The initial choice of counsel must have been prudent under all the circumstances then existing, and the subsequent decision to rely upon this counsel must also have been a reasonably wise and prudent choice." Lohm, 269 A.2d at 455; see also Geniviva, 675 A.2d at 310.

The District Court did not analyze Backos's liability under the principles set forth above. Essentially, the court required of Backos only subjective good faith; it excused Backos from liability solely because she relied on Haltzman's advice and counsel in performing her duties as trustee. But, as is clear from the preceding discussion, subjective good faith is only the beginning of the inquiry. If Backos relied on counsel, she must have done so reasonably, i.e., making a prudent choice of counsel and taking reasonable care to ensure that counsel performed effectively. Furthermore, even if she relied reasonably on counsel, Backos must have acted reasonably in performing her duties as a whole in order to avoid liability. The District Court reached none of these issues; hence, we will vacate the District Court's order to the extent it relieved Backos

40

from liability for Haltzman's breach, and remand for further proceedings in this regard.17

VI.

For the foregoing reasons, the orders of the District Court will be affirmed in part and vacated in part, and the case remanded for further proceedings consistent with this opinion. The parties will bear their own costs.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

17. We note that this does not necessarily leave Backos potentially liable for the entire amount of the surcharge, because rights of indemnity and contribution exist in trust cases. See Restatement (Second) of Trusts S 258(1). Furthermore, although the District Court erred in excusing Backos without additional inquiry from liability for the breach of trust itself, we do not think it erred in placing the burden of paying Dardovitch's attorney's fees solely on Haltzman. Unlike liability for a breach of trust, which is based only on a reasonable care test, an award of attorney's fees against a trustee, as discussed above, turns on the defendant's active culpability. The District Court found that Backos's conduct arose from "excusable neglect," and not bad faith, especially in comparison with Haltzman, Dardovitch, 1998 WL 13271, at *8, and excused her from liability for the attorney's fees. We find no error in this
conclusion.

41