**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 24-1266

———————

UNITED STATES OF AMERICA,

v.

FRANCIS ANTHONY GARZON,

Appellant

———————

Appeal from the United States District Court
for the District of New Jersey
(District Court No. 3:21-cr-00896-001)
District Judge: Honorable Zahid N. Quraishi

———————

Submitted under Third Circuit L.A.R. 34.1(a)
January 22, 2025

Before: HARDIMAN, McKEE, and AMBRO, Circuit Judges

(Opinion filed  February 4, 2025)

———————

OPINION[*]

———————

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

AMBRO, *Circuit Judge*

Defendant Francis Garzon thought he had been robbed. So he and his associates set out on a multistate vigilante mission to find the offender and reclaim Garzon's property, threatening people at gunpoint and intimidating witnesses. After Garzon pleaded guilty, the District Court sentenced him to 121 months in prison. He now appeals four rulings underpinning that sentence. Finding no error, we affirm.

## I.    Background

In September 2019, a suitcase was taken from Garzon's Brooklyn apartment while he was away on vacation. His building's security footage captured a man leaving with the suitcase, which Garzon says contained $100,000 worth of cash and valuables.

Garzon filed no police report. Instead, he took matters into his own hands. During his vacation, he had left an apartment key with an acquaintance, Adem Ayoub, and Garzon assumed Ayoub was involved with the theft. After investigating more, Garzon came to believe a man named Craig Pius was also involved and, in fact, was the man seen on the video carrying the suitcase. Garzon researched Pius and learned his address, the names of his wife and daughter, and the names and address of his parents.

In December 2019, Garzon, an associate named Endrit Kllogjeri, and another man accosted Pius's parents on the doorstep of their New Jersey home. The men insisted Pius, the couple's adult son, had stolen the suitcase from Garzon's apartment, and they demanded the valuables back with an additional $100,000 cash. Garzon made Pius's father call his son. When he did so, Garzon snatched the phone from him to speak to Pius, threatening him and his daughter. Next, Garzon pointed a gun—he disputes whether it

was a real one, a matter of legal significance—at the father's head and cocked it. Before anything else happened, Kllogjeri grabbed Garzon's arm and lowered it, saying, "No. Not now.", but told Pius's father his life was "on the line." App. 203. Garzon and the associates left, yet the extortive conduct continued for another week. During that time, for example, Garzon called Pius's family and threatened them, and he sent Pius's father videos of the family that had been recorded in secret. Eventually, police found and arrested Garzon and Kllogjeri.

In custody, Garzon admitted he went to Pius's parents' house to intimidate Pius into giving back the valuables. Though he admitted to pointing a gun at Pius's father's head to intimidate him, he claimed it was only a BB gun. Garzon said he tossed it away after leaving the house; it has never been recovered. Once charged by complaint, Garzon was released on bond. While out on bond, he found Ayoub, the acquaintance who had the keys to Garzon's apartment during his vacation, and threatened to kill him.

Garzon was then charged by a two-count indictment for Hobbs Act extortion. He pleaded guilty the week before trial. Meanwhile, Kllogjeri was convicted after his own trial. In those proceedings, Pius's parents testified that the gun on the porch was a real firearm, and Kllogjeri, despite standing to benefit, never alleged that the gun was not real.

Garzon's sentencing was the subject of substantial briefing and a thorough hearing. The District Court determined Garzon's offenses fell within a United States Sentencing Guidelines range of 121–151 months and, in January 2024, imposed a sentence at the bottom: 121 months. Garzon timely appealed.

Before us, Garzon challenges four of the District Court's rulings concerning his Guidelines range and the underlying enhancements: (1) that he possessed a firearm; (2) that he "otherwise used" that firearm and did not merely "brandish" it; (3) that he obstructed justice when he threatened Ayoub; and (4) that because of his obstruction, he forfeited any sentence reduction for acceptance of responsibility.[1]

## II.    Discussion[2]

The government must prove the application of a sentencing enhancement by a preponderance of the evidence. *United States v. Chandler*, 104 F.4th 445, 449 (3d Cir. 2024). On appeal, we review for clear error a district court's factual findings and application of the Guidelines to the facts. *United States v. Rodriguez*, 40 F.4th 117, 120–21 (3d Cir. 2022). "We find clear error if, when reviewing the entire record, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Caraballo*, 88 F.4th 239, 244 (3d Cir. 2023) (internal quotations omitted).

**A. The District Court did not clearly err in finding that Garzon used a firearm.**

Section 2B3.2(b)(3)(A) of the Guidelines provides sentencing enhancements when a weapon is used to harm or threaten others during the commission of an extortive crime.

---

[1] Garzon also obliquely challenges the substantive reasonableness of his 121-month sentence, but he makes no argument on this point beyond his four challenges to the District Court's application of the Guidelines. "Such a passing reference does not preserve the issue for appeal." *United States v. James*, 955 F.3d 336, 345 n.8 (3d Cir. 2020).

[2] The District Court had jurisdiction over Garzon's federal offenses under 18 U.S.C. § 3231. We have jurisdiction over his challenge to his sentence under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

When that weapon is a generic "dangerous weapon," enhancements of 3 and 4 levels may apply. U.S.S.G. § 2B3.2(b)(3)(A)(iv), (v); *see* § 1B1.1 cmt. n.1(E) (defining "[d]angerous weapon"). But when the weapon is a "firearm," those enhancements jump to 5, 6, and 7 levels. § 2B3.2(b)(3)(A)(i), (ii), (iii); *see* § 1B.1 cmt. n.1(H) (defining "[f]irearm").

Throughout sentencing, relying on his statement to police that he possessed only a BB gun, Garzon argued for the lower "dangerous weapon" enhancement. Instead, the District Court applied a 6-level enhancement, finding Garzon had a firearm.[3] Garzon renews that argument before us, believing the District Court based its application on insufficient evidence.

The District Court relied on two kinds of evidence. First, Pius's parents, who came face-to-face with the gun, testified that it appeared to be a real gun, and the Court found that testimony credible. Garzon resists, noting that the parents are not firearms experts, but we have previously held that the "credible" testimony of laypersons held at gunpoint can prove a gun was real. *E.g.*, *United States v. Lake*, 150 F.3d 269, 271 (3d Cir. 1998); *United States v. Beverly*, 99 F.3d 570, 572 (3d Cir. 1996); *see also United States v. Smith*, 786 F. App'x 790, 793 (10th Cir. 2019) (unpublished) ("[When] the burden of proof is a preponderance of evidence, one need not be a firearms expert to reliably state that a gun was pointed at one's face.") Second, Garzon's associate Kllogjeri, who could have benefited by testifying at his own trial that it was not a real gun, did not do so. By contrast, the only affirmative evidence supporting Garzon is his self-serving testimony.

---

[3] The precise level of enhancement was informed by the Court's finding that Garzon "otherwise used" the firearm, discussed in Part II.B below.

Reviewing the record, we cannot say there was clear error in the District Court's determination that the preponderance of the evidence supported the gun's authenticity—that is, that the gun was more likely than not a "firearm" as defined by the Guidelines. *See* U.S.S.G § 1B.1 cmt. n.1(H); *Chandler*, 104 F.4th at 449 (enhancements are proved by preponderance of evidence).

**B. The District Court did not err by finding Garzon did not merely brandish the firearm but further "otherwise used" it.[4]**

Under the Guidelines, "[b]randish[ing]" a weapon "means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known . . . in order to intimidate [a] person, regardless of whether the weapon was directly visible to that person." § 1B1.1 cmt. n.1(C). "Otherwise used" means "the conduct did not amount to the discharge of a firearm but was *more than brandishing, displaying, or possessing* a firearm or other dangerous weapon." § 1B1.1 cmt. n.1(J) (emphasis added). So while brandishing merely requires making the "presence" of the gun known to threaten, we and our sister circuits have held that the pointing of a firearm in the midst of threatening action rises to the level of "otherwise used." *E.g.*, *United States v. Orr*, 312 F.3d 141, 145 (3d Cir. 2002) (rejecting the requirement of any "verbalized threat to harm the victim" and affirming application of enhancement when defendant "point[ed] a gun at the head of [a bank's] assistant manager and order[ed] her to empty money into a garbage bag");

---

[4] The Government argues that Garzon waived this argument when he agreed at sentencing that if the District Court found he pointed the gun at Pius's father's head, he indeed "otherwise used" the gun. Answering Br. 16–17. We need not decide whether the Government is right, as we affirm on review for clear error.

6

*United States v. Dunigan*, 555 F.3d 501, 506 (5th Cir. 2009) ("By pointing the gun at [the victim's] face, as opposed to merely displaying it for intimidation purposes, [defendant] 'otherwise used' the gun rather than 'brandished' it.").

In his brief to us, Garzon argues that "otherwise used" requires more than just pointing the gun. Opening Br. 15–21. For the reasons just articulated, we agree. Garzon pointed the gun at Pius's father's head, cocked it, and demanded he make Pius return the valuables, so the District Court correctly applied the enhancement here.

**C. The District Court correctly applied the obstruction-of-justice enhancement for Garzon's threat to "kill" Ayoub.**

Section 3C1.1 of the Guidelines provides a 2-level enhancement when the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution" and the conduct "related to . . . the defendant's offense of conviction." This includes threatening witnesses. *See* § 3C1.1 cmt. n.4(A).

At sentencing, the District Court heard testimony from Ayoub about Garzon's threats and viewed videos of the incident, including one Ayoub took on his cell phone. The District Court found Ayoub credible, determined his testimony tracked the videos, and applied the enhancement.

Before us, Garzon challenges minor factual inconsistencies in Ayoub's testimony and the District Court's credibility determination. Only in "rare circumstances" will we hold a district court's credibility determination to be clearly erroneous, but we do not find those circumstances here. *Dardovitch v. Haltzman*, 190 F.3d 125, 140 (3d Cir. 1999).

7

"[T]he record, as well as common sense, amply supports the District Court's conclusion as to the weight to be accorded to" Ayoub's testimony. *Id.* Further, the "insignificant testimonial inconsistencies" Garzon identifies are not sufficient grounds to "reject[] a positive credibility finding under a clear error standard." *Alimbaev v. Att'y Gen.*, 872 F.3d 188, 198 (3d Cir. 2017) (internal quotation marks omitted).

Because the District Court did not err in crediting Ayoub's testimony about Garzon's threats, it did not clearly err in its application of the enhancement for obstruction of justice based on that testimony.

### D. The District Court did not err by denying an acceptance-of-responsibility reduction in Garzon's offense level.

Under U.S.S.G. § 3E1.1(a), a defendant can receive a two-level decrease in offense level for accepting responsibility—often by pleading guilty, as Garzon did. But sensibly, that Guideline also provides that application of an obstruction-of-justice enhancement, *see* Part II.C above, bars the reduction for accepting responsibility except in "extraordinary" circumstances. § 3E1.1 cmt. n.4.

Garzon argues that the District Court erred by deciding in rote manner that the obstruction-of-justice enhancement per se defeated the acceptance-of-responsibility credit—that is, without evaluating whether his was an extraordinary circumstance. He is wrong. The transcript shows the District Court made such a finding, so we affirm. *See* App. 143 ("With respect to the acceptance of responsibility enhancement, I find that it no longer applies. I'm taking away Mr. Garzon's points. He threatened a witness. That is

8

absolutely unacceptable. It meets the obstruction of justice enhancement. There's nothing extraordinary about this case.").[5]

*    *    *

We perceive no clear error in the District Court's findings that Garzon "otherwise use[d]" a "firearm," obstructed justice, and did not present extraordinary circumstances that would preserve a Guidelines reduction for acceptance of responsibility. Accordingly, we affirm his sentence.

---

[5] Were this not enough, we observe, without deciding, that Garzon may have waived this issue when his counsel admitted he had no argument for why this might be an extraordinary circumstance. *See* App. 138 (Defense counsel, to the Court: "[Garzon]'s not going to get [the] acceptance of responsibility reduction based on your finding of the obstruction. I do not have arguments for extraordinary [circumstances]."). *See United States v. Davis*, 105 F.4th 541, 547 (3d Cir. 2024) (discussing waiver in the context of sentencing hearings).